RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0077P (6th Cir.)
File Name: 02a0077p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*                                    No. 01-3439

RICHARD W. CANESTRARO,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 00-00027—Sandra S. Beckwith, District Judge.

Submitted: December 4, 2001

Decided and Filed: March 1, 2002

Before: KENNEDY, MOORE, and COLE, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** Frank M. Pignatelli, EMERSHAW, MUSHKAT & SCHNEIER, Akron, Ohio, for Appellant. Kathleen M. Brinkman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

other evidence subsequent to the date of his alleged withdrawal that would tend to refute his continued acquiescence in the conspiracy. We conclude, therefore, that the district court did not clearly err in its factual finding that Canestraro's actions indicated his continued acquiescence in the conspiracy.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the sentence imposed by the district court.

---

### OPINION

---

KAREN NELSON MOORE, Circuit Judge. The defendant, Richard W. Canestraro, pleaded guilty to one count of aiding and abetting the acceptance of an unlawful gratuity by a public official. He appeals the district court's determination of his offense level for the purposes of sentencing. In particular, Canestraro argues that the district court erred in finding that his offense involved more than one gratuity and in calculating the amount of the gratuities attributable to him. For the reasons stated below, we **AFFIRM** the sentence imposed by the district court.

## I. BACKGROUND

The undisputed facts of this case are set forth in an attachment to the defendant's plea agreement. The defendant, Richard W. Canestraro, was the Executive Director of the North Ohio Valley Air Authority (NOVAA) from July 1995 until NOVAA ceased to exist on September 30, 1997. Prior to accepting the position as Executive Director, Canestraro was a member of the NOVAA board of directors. NOVAA was a multi-county air quality regulatory agency headquartered in Steubenville, Ohio. NOVAA received funds from the United States Environmental Protection Agency, through the Ohio Environmental Protection Agency ("Ohio EPA"), for the purpose of enforcing federal and state air quality laws within its six counties, including Jefferson County, where the Pine Hollow C&D Landfill ("Pine Hollow") is located. Canestraro's predecessor as Executive Director of NOVAA was Patsy J. DeLuca. As Executive Director and former Executive Director of NOVAA, DeLuca was a public official and former public official for the purposes of the federal anti-gratuity statute. *See* 18 U.S.C. § 210(a)(1) & (c)(1)(B).

In November 1993, DeLuca and Vincent Zumpano, a NOVAA employee, attempted to negotiate a contract with the

assist in getting permits for the landfill." J.A. at 14. Therefore, the district court's factual conclusion that the full amount paid by Vukelic was both aided by and reasonably foreseeable to Canestraro was not clear error.

## 2. Canestraro's Alleged Withdrawal from Foggia II

Canestraro next argues that he withdrew from the conspiracy at the meeting of the Foggia II partners and RSV, which he called in late Spring or early Summer of 1995. He contends that Vukelic's testimony established that he took affirmative action to disavow the conspiracy. Canestraro therefore claims that he should not be held responsible for any gratuities received after this meeting. Mr. Vukelic's testimony tended to show that approximately $76,000 to $77,000 had been paid to Foggia II at this time. Using this figure, Canestraro would have received a six-level enhancement, rather than a seven-level enhancement. *See* U.S.S.G. § 2F1.1(b).

Even if Canestraro's actions at the meeting in question were sufficient to constitute a withdrawal, this Circuit has explained that the effect of a withdrawal from a conspiracy "may be eliminated if the defendant's state of mind after the act evidences continued acquiescence" in the criminal activity. *United States v. Lash*, 937 F.2d 1077, 1085 (6th Cir. 1991), *cert. denied*, 502 U.S. 949 (1991), and *cert. denied*, 502 U.S. 1061 (1992). Whether a defendant's subsequent actions evince a state of mind negating a withdrawal is a question of fact, and therefore reviewed only for clear error. *Accord id.* at 1084-85 (noting that state of mind indicating continued acquiescence was a jury question in criminal conspiracy trial). The district court found that "the record shows without objection that in December of 1995, [Canestraro] called Mr. Vukelic, the payor of the gratuities, to ask for an accounting of the gratuities paid during the year. That, it seems to me, is the action of a person who is at least considering the possibility of securing his share of the gratuities paid." J.A. at 119. Canestraro does not dispute making the phone call cited by the district court, and offers no

owner of Pine Hollow, whereby the owner would pay them to assist in obtaining permits for Pine Hollow or to assist in the sale of Pine Hollow. At that time and thereafter, NOVAA and Ohio EPA were responsible for enforcing air quality laws with regard to Pine Hollow, including the issuance of such permits. The owner did not sign the proposed contract. Nevertheless, in November 1993, Ohio EPA granted Pine Hollow a temporary permit to accept debris from two sites being demolished by RSV, Inc., a demolition-construction company owned by Robert S. Vukelic. The owner of Pine Hollow died in December 1993. After his death, DeLuca and Zumpano unsuccessfully attempted to get representatives of the owner's estate to pay the Foggia Company, an organization formed by DeLuca and Zumpano, to assist in the sale of Pine Hollow.

Canestraro became aware of the activities of DeLuca and Zumpano regarding Pine Hollow when he became involved in efforts to sell the landfill and obtain Ohio EPA permits. Sometime after he learned of DeLuca and Zumpano's involvement with Pine Hollow, Canestraro agreed to assist the Foggia Company's efforts. In particular, Canestraro prepared projections concerning the operations and financing of the landfill. The projections were prepared to facilitate the sale of the Pine Hollow landfill to Vukelic, and to assist Foggia in obtaining a contract with Vukelic, whereby Vukelic would pay Foggia for assistance in getting permits for the landfill. Canestraro agreed to accept a fee of $3500 from Foggia for his work in preparing the projections.

In early 1994, Vukelic purchased Pine Hollow. On April 20, 1994, DeLuca, Zumpano, and Canestraro, then operating as Foggia II, entered into a written agreement with RSV, which obligated RSV to pay $330,000 to Foggia II for advice regarding RSV's pending permit applications before Ohio EPA for new or expanded sites at Pine Hollow. The agreement also provided that RSV would pay a "success fee" of $60,000 upon Pine Hollow's receipt of an Ohio EPA permit to operate. The agreement was signed by Vukelic as RSV President and DeLuca as Chairman of Foggia II.

On April 20, 1994, DeLuca, Zumpano, and Canestraro entered into a written agreement in which they agreed to divide equally any compensation paid to Foggia II. On April 21, 1994, DeLuca, Zumpano, and Canestraro entered into a separate written agreement in which they agreed to divide equally the $330,000 that Foggia II was to receive under its contract with RSV. The three members of Foggia II also reached an oral agreement to pay 50% of the payments from RSV to a subconsultant, who would assist in obtaining the operating permit for Pine Hollow.

Between April 1994 and October 1996, Vukelic made twenty separate payments to Foggia II, totaling $169,750. On February 3, 1995, Ohio EPA granted Pine Hollow a permit to accept waste from any demolition site. Pursuant to RSV's Agreement with Foggia II, Vukelic paid the $60,000 "success fee" to Foggia II in two payments — one of $20,000 on March 10, 1995, and another of $40,000 on April 14, 1995. Foggia II paid Canestraro $3000 on March 10, 1995, and an additional $500 on June 30, 1995, for Canestraro's work in preparing the projections for Pine Hollow. The government acknowledges it has no evidence that Foggia II made any other payments to Canestraro.

While Canestraro admitted to the above-stated facts pursuant to his plea agreement, he denies that he was a true partner in Foggia II. He claims he did not receive one-third of the $169,750 paid to Foggia II by Vukelic. Canestraro further claims he withdrew from the Foggia II partnership sometime in 1995. At Canestraro's sentencing, Vukelic testified that Canestraro called a meeting of the Foggia II partners and RSV in the late Spring or early Summer of 1995. At this meeting, Canestraro apparently stated that he wanted his name taken off the agreement between RSV and Foggia II, and that he "wanted out" of the venture. At the time of the meeting, Vukelic had made payments to Foggia II totaling between $76,000 and $77,000.

Canestraro admitted that on December 5, 1995, he called Vukelic to ask for an accounting of the gratuities paid

(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

U.S.S.G. § 1B1.3(a)(1). The district court found that it was reasonably foreseeable to Canestraro that Vukelic would pay $169,750 in illegal gratuities, and therefore used this sum to determine Canestraro's sentence. Whether the criminal acts of others in a jointly undertaken criminal activity are reasonably foreseeable is a question of fact, reviewable only for clear error.[2] *See United States v. Hamilton*, 263 F.3d 645, 654 (6th Cir. 2001).

We conclude that the district court's finding was amply supported by the record. As the district court noted, Canestraro signed an agreement obligating Vukelic to pay $330,000 in gratuities, and another agreement concerning the distribution of those gratuities. The court explained that "[t]he fact that he received only $3500 is not legally significant, because his participation in the agreement knowingly facilitated the payment of $169,750." J.A. at 119. Indeed, in the statement of facts accompanying the Plea Agreement, Canestraro admitted that he prepared projections for Pine Hollow "[i]n order to facilitate . . . a contract that Foggia wanted that would require Vukelic to pay Foggia to

---

[2] This Court has also held that calculations of the amount of loss for determining a defendant's relevant conduct are reviewed for clear error. *United States v. Guthrie*, 144 F.3d 1006, 1011 (6th Cir. 1998).

throughout the year. He left a phone message for Vukelic, but Vukelic never returned his call.

On March 24, 2000, Canestraro waived indictment and pleaded guilty to a one-count information charging him with aiding and abetting the acceptance of an unlawful gratuity by a public official. The district court imposed a sentence of twelve months and one day of imprisonment, one year of supervised release, a $10,000 fine, and a $100 special assessment. Canestraro filed a timely notice of appeal on April 26, 2001. On May 30, 2001, the district court issued an order denying Canestraro's motion for bond pending appeal.

## II. ANALYSIS

### A. More Than One Gratuity

The district court enhanced Canestraro's offense level by two levels, pursuant to § 2C1.2(b)(1) of the Sentencing Guidelines, which authorizes such an enhancement "if the offense involved more than one gratuity." U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 2C1.2(b)(1) (1998). Canestraro contends that the district court erred in finding that his conduct involved multiple illegal gratuities. This Court reviews the district court's findings of fact at sentencing for clear error, while the district court's interpretations of the Sentencing Guidelines are reviewed de novo. *United States v. Brown*, 147 F.3d 477, 485 (6th Cir. 1998). The district court's application of the Guidelines to undisputed facts, however, is reviewed deferentially. *United States v. Ennenga*, 263 F.3d 499, 502 (6th Cir. 2001). Insofar as Canestraro challenges the district court's determination of what factors may be considered in determining multiplicity, this is a "purely legal matter" that inquires into the "basic intent" of the Guidelines for which de novo review is appropriate. *Buford v. United States*, 532 U.S. 59, 121 S. Ct. 1276, 1280-81 (2001); *see also United States v. Humphrey*, --F.3d--, No. 00-5180, 2002 WL 112482, at *5 n.4 (6th Cir.) (concluding that legal question was presented as to whether "position of public trust" provision in the Guidelines required showing of factors indicating a level of discretion similar to that of a

---

a general consultancy fee and a $60,000 "success fee" to be paid upon Pine Hollow's receipt of an operating permit. *Cf. United States v. Middlemiss*, 217 F.3d 112, 124 (2d Cir. 2000) (affirming finding of more than one act of extortion where separate lump sum "buyout" payment was made in addition to series of monthly installments). The fact that the "success fee" was designated separately in the agreement with Vukelic, and was subject to different conditions of payment, supports the finding that it constituted a separate gratuity, distinct from the general consultancy fee. Therefore, the district court's finding that Canestraro was responsible for more than one gratuity was not error.

### B. Value of the Illegal Gratuities

#### 1. Reasonably Foreseeable

Canestraro also challenges the district court's determination of the value of the illegal gratuities used to determine his offense level. Section 2C1.2(b)(2)(A) of the Sentencing Guidelines provides that "[i]f the value of the gratuity exceeded $2,000, increase [the offense level] by the corresponding number of levels from the table in §2F1.1." The district court determined that the value of the gratuity attributable to Canestraro as relevant conduct was $169,750, the entire amount paid to Foggia II by Vukelic. Consequently, the district judge applied a seven-level enhancement, as prescribed by the Guidelines for gratuities exceeding $120,000. U.S.S.G. § 2F1.1(b)(1).

Canestraro argues that he should be held accountable only for the $3500 fee he received for preparing the Pine Hollow projections. He contends that he was never a "true partner" in the conspiracy, and that he never received any portion of the $169,750 paid to Foggia II.

The Sentencing Guidelines provide that relevant conduct, for the purposes of determining the defendant's offense level, includes:

fiduciary). Insofar as Canestraro challenges the district court's conclusion that the specific circumstances of his case show that he aided and abetted the receipt of "more than one gratuity," we apply a deferential standard of review.

The commentary to § 2C1.2 states that "[r]elated payments that, in essence, constitute a single gratuity (*e.g.*, separate payments for airfare and hotel for a single vacation trip) are to be treated as a single gratuity, even if charged in separate counts." U.S.S.G. § 2C1.2 commentary, applic. note 4. Other than the vacation trip example, the commentary provides little direction as to the kinds of circumstances that would warrant a finding that multiple related payments constitute a single gratuity. Canestraro contends that the court should look for interpretive guidance for the commentary to the bribery/extortion guideline, which suggests that courts consider whether the offense conduct involves "installment payments for a single action," U.S.S.G. § 2C1.1 commentary, applic. note 6, when determining whether an offense involves "more than one bribe or extortion," U.S.S.G. § 2C1.1(b)(1). We agree that this is a relevant consideration. Although a gratuity, as opposed to a bribe, does not require that the illegal payment be offered as a quid pro quo to influence an official action, the fact that a series of gratuity payments are offered in connection with multiple official acts would suggest that the individual payments are distinct benefits with different terms of payment, and should therefore be considered separately.

Canestraro contends that the undisputed facts show that he is responsible for the receipt of only one $3500 gratuity, paid in two installments, which was intended to influence a single action — the preparation of projections for Pine Hollow. We conclude that this objection is without merit. Canestraro pleaded guilty to aiding and abetting the receipt of illegal gratuities by public official Patsy DeLuca, not to receiving

unlawful gratuities himself.[1] Whether or not Canestraro's $3500 payment for completing the projections is characterized as a single gratuity, the undisputed facts showed that multiple gratuities were paid to Foggia II, of which DeLuca was a partner, pursuant to the agreement with Vukelic.

In the statement of facts accompanying Canestraro's plea agreement, he admitted that his acts facilitated the agreement between Vukelic and Foggia II, pursuant to which Vukelic made twenty separate payments totaling $169,750. Canestraro contends that these payments were mere "installments" on a single $330,000 gratuity. We need not decide that issue, however. Even if we assume that Canestraro is correct that the $330,000 represented a single gratuity, it is undisputed that the agreement between Foggia II and RSV provided for two distinct categories of payment:

---

[1] There appears to have been some confusion as to this issue in the sentencing hearing as well. The only rationale provided by the sentencing judge for rejecting Canestraro's objection to the § 2C1.2(b)(1) enhancement was that "the record clearly shows that he received two payments — one of $3000 and one of $500." J.A. at 119. Nevertheless, the district judge had already found that the full extent of the payments made to Foggia II were reasonably foreseeable, and therefore attributable, to Canestraro. The district judge also found that Canestraro entered an agreement to receive an equal share of the total payments received by Foggia II, which implicated him directly in the receipt of multiple gratuities. These findings of fact are sufficient to affirm the application of the two-level enhancement, even if the district court did not cite them as grounds for the basis of its decision. *See United States v. Talley*, 164 F.3d 989, 999 n.4 (6th Cir.) (noting that district court decision should be affirmed if correct for any reason, even if not relied upon by the district court), *cert. denied*, 526 U.S. 1137 (1999). In its order denying bond pending appeal, moreover, the district court explicitly stated its belief that the enhancement for multiple gratuities could be affirmed on the basis of the payments made to Foggia II, as opposed to the $3500 paid to Canestraro directly. J.A. at 74 (Bond Order at 5) (finding that reversal of multiple gratuities finding on appeal is unlikely because "[n]ot only did the Defendant receive a 'tipping fee' of $3,500, paid in two installments, for preparation of financial projections, but through his participation in the Foggia II partnership, was to share equally $330,000 in consulting fees and in a $60,000 success fee").