**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Fernando Endaya ELIAS,**
**Defendant–Appellant.**

No. 03–5028.

United States Court of Appeals,
Sixth Circuit.

Aug. 25, 2004.

Candace G. Hill, Asst. U.S. Attorney, James H. Barr, Asst. U.S. Attorney, Terry M. Cushing, Asst. U.S. Attorney, U.S. Attorney's Office, Louisville, KY, for Plaintiff–Appellee.

Mark Wettle, Louisville, KY, for Defendant–Appellant.

Before BATCHELDER and GIBBONS, Circuit Judges; and COHN, District Judge.*

GIBBONS, Circuit Judge.

Fernando Elias was recruited into a check cashing operation, in which Elias and others were provided with fraudulent identification and counterfeit checks to cash at various banks in Louisville, Kentucky. After negotiating the forged checks, Elias turned over the acquired cash to his recruiter, who then paid him for his service. Elias was charged with two counts of bank fraud in the United States District Court for the Western District of Kentucky. He pled guilty to both counts and was sentenced to twenty-four months imprisonment. For the purpose of sentencing Elias, the district court calculated the amount of loss as the total amount of counterfeit checks that Elias and his team members (who cashed checks at the same time and location as Elias) negotiated. On appeal, Elias claims that the district court should have attributed to him only the counterfeit checks that he personally cashed. Elias also contends that the district court should have applied a mitigating role adjustment and reduced his offense level during sentencing. For the reasons set forth below, we affirm the decision of the district court.

### I.

Around June 2000, Elias was recruited in Los Angeles, California, to participate in a scheme to pass counterfeit checks.[1] His recruiter, a man named "John," arranged for Elias and other "team members"— Michael Nelson and Du Huynh—to travel

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. This factual history is derived from Elias's presentence report. None of the parties objected to the characterization of the offense conduct described in the report that is presented here.

to Louisville, Kentucky, where they would cash forged checks at various local banks. John not only arranged for the team's transportation and lodging, but he also supervised them during the operation. In Louisville, John delivered the team, which included Elias, to target banks, provided them with counterfeit checks and accompanying false identification, and instructed them to cash the checks provided. All team members entered a particular bank at the same time. John instructed the team that they were to exit the bank if the transaction lasted longer than five minutes or if bank employees seemed to become suspicious. After the team members succeeded in cashing the counterfeit checks, they handed over the proceeds to John. John then paid Nelson, Huynh, and Elias around $200 to $250 for each check negotiated.

Elias and his team executed the Louisville scheme beginning in December 2000. On December 13 and 14, 2000, Elias, Nelson, and Huynh cashed counterfeit checks—totaling $37,948.61—at PNC Bank branches in Louisville. On January 12, 2001, the scheme continued when Elias and Huynh cashed another series of fraudulent payroll checks at various Bank One branches in Louisville. The checks negotiated by Elias and Huynh on that day totaled $14,345.31. Therefore, the total amount acquired during the Louisville operation, in which Elias was a participant, was $52,293.92.

On July 1, 2002, Elias was charged with two counts of bank fraud, in violation of 18 U.S.C. § 1344, in the U.S. District Court for the Western District of Kentucky. He entered into a plea agreement pursuant to Fed.R.Crim.P. 11 as to both counts and was sentenced by the district court to a term of twenty-four months in prison on each of the two counts, to be served concurrently, and a five year term of super-

vised release. Elias was also ordered to pay a $200 assessment and $18,307.55 in restitution. In determining Elias's sentence, the court concluded that the amount of the loss was $52,293.92. Elias filed a timely notice of appeal of the district court's judgment.

## II.

Elias argues that in calculating his offense level, the district court improperly ascribed to him losses resulting from forged checks cashed by his co-participants, Nelson and Huynh. He claims that the district court should have only considered losses of approximately $18,000 from the counterfeit checks that he personally negotiated. The United States Sentencing Guidelines provide that relevant conduct, which is used to determine the applicable guideline range, includes

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B). The district court found that Elias had engaged in jointly undertaken criminal activity because he was "not acting on his own" but instead was part of a group that traveled to Louisville and together cashed counterfeit checks. As a result, the district court considered the combined losses of Elias and his group in Louisville—$52,293.92—in calculating Elias's offense level. The Sentencing Guidelines provide that for offenses involving counterfeit instruments,

the base offense level is six with an increase of six levels if the loss was greater than $30,000, but no more than $70,000. U.S.S.G. § 2B1.1(a)(2) & (b)(1)(D). Elias challenges the application of this six level increase to him because his own conduct resulted in a loss of approximately $18,000.

This court reviews the district court's interpretation of the Sentencing Guidelines *de novo,* while findings of fact made during sentencing are reviewed for clear error. *United States v. Canestraro,* 282 F.3d 427, 431 (6th Cir.2002). Therefore, we review a district court's "finding that the criminal acts of others in a jointly undertaken criminal activity are reasonably foreseeable and in furtherance of the jointly undertaken criminal activity" for clear error. *United States v. Tocco,* 306 F.3d 279, 284 (6th Cir.2002) (citing *Canestraro,* 282 F.3d at 433; *United States v. Hamilton,* 263 F.3d 645, 654 (6th Cir.2001)). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Charles,* 138 F.3d 257, 262 (6th Cir.1998)).

For a defendant to be held accountable for the conduct of others through jointly undertaken criminal activity, "(1) the conduct must be in furtherance of the jointly undertaken criminal activity; and (2) the conduct must be reasonably foreseeable in connection with that criminal activity." *United States v. Campbell,* 279 F.3d 392, 399 (6th Cir.2002) (citing U.S.S.G. § 1B1.3, cmt. n. 2). Application Note Two of U.S.S.G. § 1B1.3, which provides this test, also states that:

> In order to determine the defendant's accountability for the conduct of others under [U.S.S.G. § 1B1.3(a)(1)(B)], the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement).

In *Campbell,* this court, following the Second Circuit's interpretation of § 1B1.3(a)(1)(B) in *United States v. Studley,* 47 F.3d 569 (2d Cir.1995), held that § 1B1.3(a)(1)(B) "requires that the district court make *particularized* findings with respect to both the scope of the defendant's agreement *and* the foreseeability of his co-conspirators' conduct before holding the defendant accountable for the scope of the entire conspiracy." 279 F.3d at 400. The *Campbell* court noted that the first prong of the *Studley* test

> serves to differentiate between co-conspirators' varying degrees of culpability. In order to determine the scope of the defendant's agreement, the district court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.

*Id.* (internal quotation and citation omitted). Elias argues that the district court failed to make the necessary findings required by § 1B1.3(a)(1)(B) before holding him accountable for the actions of Nelson and Huynh.

At Elias's sentencing hearing, the district court provided the following explanations for holding Elias accountable for jointly undertaken criminal activity:

> [Elias] was one in this process of two or three other people that essentially did the same thing that he did and they did it at the same place at the same time and that's the basis for the enhancement here to six levels, I think.

> . . . . .

> As I understand the facts here, these individuals came from California to other places and then as a group came to Louisville, and then went out to hit on

these particular banks on these days by all going in there at the same time and attempting to cash these various checks at the same time and then they all left Louisville and went on somewhere else.

.    .    .    .    .

[T]hese people were working in concert and that they all came to Louisville, all did the same thing with the same checks gotten them from the same place with the same IDs, cashed at the same bank. They didn't go out to where [Elias] went to this bank and another person went to a different bank. They all went to the same bank at the same time to cash six different checks.... [T]hey all did the same thing together as a group.

.    .    .    .    .

They went in as a group. They came from the same source city, they were brought to the bank, they went in as a group, they all did the same thing. They had the same checks from the same fraudulent payor on each occasion. In other words, the checks were the same and they were all attempting to cash the checks at the same time at the same bank and they did it twice.

We conclude that the district court substantially complied with the requirements set forth in *Campbell.* The court made particularized findings with respect to the foreseeability of Nelson's and Huynh's conduct. Elias entered target banks with Nelson and Huynh, and the group proceeded to cash fraudulent checks together. As to the scope of Elias's agreement, *Campbell* specifically notes that the district court may consider any "implicit agreement fairly inferred from the conduct of the defendant and others." 279 F.3d at 400. The acts of entering the banks together and cashing fraudulent checks as a group also provide the basis for finding an implicit agreement among Elias, Nelson

and Huynh. Furthermore, remanding this case for particularized findings as to the scope of Elias's agreement would be a futile exercise. Elias did not object to the description of offense conduct presented in his presentence report, making that report the factual record in this case. The district court adopted a restrictive view of the scope of the jointly undertaken activity; he did not hold Elias responsible for parallel acts by other teams or even for acts by his own team on dates or in locations other than the three days in question in Louisville. After examining the presentence report, it is clear to us that there is no record in this case from which findings could be made that would support any conclusion other than that reached by the district court. A remand so that the district court can use the words "scope of the defendant's agreement" is unwarranted. Therefore, the district court's finding as to relevant conduct based on Elias's participation in jointly undertaken activity was not clearly erroneous.

### III.

■ Elias next argues that the district court should have reduced his sentence because of his small role in the overall fraudulent check cashing operation. This court traditionally has reviewed the denial of a mitigating role adjustment to a defendant's offense level for clear error. *United States v. Roberts,* 223 F.3d 377, 379–80 (6th Cir.2000). We have also reviewed a district court's factual findings regarding a mitigating role adjustment under the clearly erroneous standard, while applying *de novo* review to the district court's legal conclusions. *Id.* at 380.

The Sentencing Guidelines provide that if a defendant was a minimal participant in criminal activity, then his offense level may be decreased by four levels. U.S.S.G. § 3B1.2. If the defendant was a minor

participant, then his offense level may be decreased by two levels. *Id.* For cases falling between minimal participation and minor participation, the defendant's offense level may be decreased by three levels. *Id.* These adjustments are available to a defendant "who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2 cmt. n. 3. In this case, as the proponent of a downward adjustment, Elias bears the burden of proving a mitigating role by a preponderance of the evidence. *Roberts,* 223 F.3d at 379.

Under either standard of review available to this court, we conclude that the district court properly denied the mitigating role adjustment to Elias. Elias argues that his only role was to walk into a bank, present documents that he had been provided, and then turn over the profits of the operation. These actions indicate that Elias was at least as culpable as an average participant in the fraudulent scheme. While Elias's role may not have placed him high on the operation's organizational pyramid, his actions enabled the very purpose of the scam—to profit by fraudulently drawing funds from corporate bank accounts. Therefore, it was proper for the district court not to apply a mitigating role adjustment to Elias's offense level.

## IV.

For the foregoing reasons, we affirm the district court's judgment.