NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0025n.06

No. 14-4281

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Jan 14, 2016 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| KEELAN HARRIS, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: KEITH, CLAY, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Keelan Harris appeals the 120-month sentence imposed after he pleaded guilty, without a plea agreement, to one count of conspiracy to commit wire fraud, seven counts of wire fraud, and four counts of money laundering. Harris argues his below-guidelines sentence is procedurally and substantively unreasonable. We **AFFIRM**.

## I.

Harris, his older brother Kevin Harris (Kevin), and Karen Starr operated two financial businesses in Warren, Ohio. Both companies—Complete Developments, LLC ("CDL"), and International Investments, Inc. ("I-3") ("the Companies," jointly)—offered investment opportunities to the general public. Funds could be invested for fixed periods of three, six, or twelve months, and were to be used to purchase and trade foreign exchange contracts, develop commercial real estate, and invest in other financial products. The Companies promised their customers interest payments of seven to twelve percent per month and a return of at least eighty percent of the principal at the conclusion of the investment period.

Kevin was the driving force behind the new ventures. He and his associates established the first of the two companies, CDL, in 2006. Harris joined Kevin in November 2006. Harris and Starr then set up the second company, I-3. Kevin and Starr together served as the face of the businesses. They solicited customers with offers of guaranteed monthly interest payments, mainly through profits from foreign exchange and currency trading. Kevin and Starr would then identify large investors, called "top members," and encourage them to recruit new investors. Online advertisements for the Companies reached beyond northern Ohio, and many new customers came from Canada. Eventually, the Companies had a customer base in the hundreds and raised approximately $15.8 million in investment funds.

Harris's role was mostly behind the scenes. According to customers and employees, Harris managed the Companies' finances and transactions with investors. He opened the Companies' bank accounts and maintained signatory authority. He also supervised the receipt of funds wired from customers and managed the interest payments made in return. Harris dealt directly with customers in this role. According to bank employees, Harris would deposit and withdraw thousands of dollars in cash, sometimes in duffel bags. These transactions were typically just under the reporting limit of $10,000. When asked, Harris told bank employees he was the owner of a business that helped Canadian customers invest.

In fact, the Companies invested only a small portion of the $15.8 million. Although the Companies advertised foreign exchange trading, neither company had a corporate trading account; the only trading occurred in Kevin's and Starr's personal and joint trading accounts. Kevin and Starr deposited $932,000 into these accounts, including customer funds, but lost $911,970. They ceased trading in August 2007, and the remaining funds were not invested as advertised. Instead, a large portion of new customer funds were redirected to older customers as

purported interest payments, or as repayment of their principal investment at the conclusion of the fixed term. The "top members" would receive larger interest payments to create the illusion of financial health. The Government described the operation as a Ponzi scheme.

The remaining funds were spent on the Companies' corporate overhead, personal expenditures, and other businesses. Harris and Kevin charged $398,000 to the Companies for transportation, shopping, and international travel, among other expenses. Harris received rent-free housing and a vehicle, and traveled to China, Colombia, Panama, and the United Arab Emirates. Starr received payments of $308,000. Cash withdrawals accounted for another $1.9 million. Transfers to other businesses included $3.5 million to RAK Palace Rent-a-Car in Abu Dhabi, $760,000 to UCAN for a CDL shell company, and funding for failed ventures in China and the country of Georgia. Customer deposits also financed the maintenance of low-value rental properties in Warren, Ohio. Further, Harris used I-3 accounts for his own side projects, including an adult website and a nightclub in Colombia. At one point, Harris went into a bank with a $1,000,000 cashier's check and told the employees that he was a real-estate developer with an international business.

The Companies soon ran into problems. One of CDL's banks froze its accounts in November 2007 after flagging suspicious activity. The bank spoke with Harris, wrote an official check for the remaining funds, and closed the accounts. In July 2008, the Companies stopped making interest payments to customers. In August 2008, CDL notified customers that all trading had been suspended. In October 2008, CDL and I-3 sent additional communications explaining that seventy percent of customer funds had been lost, and led customers to believe the remaining thirty percent was being held offshore and would eventually be repaid. At the end of the month,

CDL told customers that its bank accounts would be involuntarily closed. Both CDL and I-3 stopped communicating with customers around March 2009.

On August 20, 2013, a federal grand jury indicted Harris on one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, seven counts of wire fraud, in violation of 18 U.S.C. § 1343, and four counts of money laundering, in violation of 18 U.S.C. § 1957(a). The indictment also charged Starr on the first eight counts; she is reportedly a fugitive in the United Arab Emirates. Kevin pleaded guilty to a separate indictment in 2012 and received an eighty-seven month sentence. Harris pleaded not guilty to the indictment at his initial appearance and arraignment, but he later changed his plea to guilty of all charges. There was no plea agreement. The Probation Office issued a Presentence Investigation Report (PSR) calculating a Guidelines imprisonment range of 210 to 262 months and restitution of $15,596,345.11.

At sentencing, Harris objected to the $15.6 million loss amount and 308 victims attributed to him by the PSR, which affected his base offense level and the recommended restitution. He argued he should be held responsible for no more than $120,000 in loss—his salary and some expenses. Harris's cousin Reema Owens testified that Harris "didn't really know what was going on" and "basically did what his brother told him to do." R. 57, Sentencing Tr., PID 395–96. She explained that Kevin was aggressive, controlling, and manipulative. Harris also argued that a below-guidelines sentence would be appropriate because the applicable fraud guideline, U.S.S.G. § 2B1.1, overstated the seriousness of the offense when losses are high. He presented data from the Sentencing Commission showing that courts across the country sentenced defendants with similar loss amounts to a median of fifty-two months, and emphasized that Kevin received an eighty-seven month sentence.

The district court noted Harris's objections but found the $15,596,345.11 loss amount and 308 victim count proper. The court granted Harris a three-level reduction for acceptance of responsibility and calculated a Guidelines range of 151 to 198 months. After reviewing the § 3553(a) sentencing factors, the district court found that a sentence of 120 months would be sufficient but not greater than necessary. The court imposed a 120-month sentence on each of the twelve counts, to run concurrently, and ordered restitution in the amount of $15,596,345.11.

## II.

We review sentencing determinations for reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). "Sentences are reviewed for procedural as well as substantive reasonableness." *United States v. Robinson*, 778 F.3d 515, 518 (6th Cir. 2015). A sentence is procedurally unreasonable if the sentencing court "failed to calculate the Guidelines range properly; treated the Guidelines as mandatory; failed to consider the factors prescribed at 18 U.S.C. § 3553(a); based the sentence on clearly erroneous facts; or failed to adequately explain the sentence." *United States v. Coppenger*, 775 F.3d 799, 803 (6th Cir. 2015). A sentence is substantively unreasonable if the sentencing court "imposed a sentence arbitrarily, based on impermissible factors, or unreasonably weighed a pertinent factor." *Id.*

## III.

Harris identifies three procedural errors in the calculation of his Guidelines sentencing range, arguing the district court (1) miscalculated the amount-of-loss enhancement by holding him accountable for the loss caused by the entire conspiracy, (2) improperly held him responsible for all 308 victims when applying the number-of-victims enhancement, and (3) failed to rule on his request for a mitigating-role adjustment.

**A.**

Harris first challenges the district court's application of a twenty-level enhancement for a loss amount of $15.6 million. *See* U.S.S.G § 2B1.1(b)(1)(K). We review the method used to calculate loss de novo and the factual loss determination for clear error. *United States v. Wendlant*, 714 F.3d 388, 393 (6th Cir. 2013). The district court must make two distinct findings when calculating the loss amount. *United States v. Campbell*, 279 F.3d 392, 399–400 (6th Cir. 2002). First, the district court must make particularized findings about "the scope of the defendant's agreement." *Id.* at 400; U.S.S.G. § 1B1.3(a)(1)(B) & cmt. n.2. This finding "differentiate[s] between co-conspirators' varying degrees of culpability." *Campbell*, 279 F.3d at 400. The district court may consider "any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others," U.S.S.G. § 1B1.3 cmt. n.2, but mere "aware[ness] of the scope of the overall operation" is insufficient, *Campbell*, 279 F.3d at 400. Next, the district court must make particularized findings about "the foreseeability of [the defendant's] co-conspirators' conduct." *Id.*; U.S.S.G. § 1B1.3(a)(1)(B). Only conduct reasonably foreseeable to the particular defendant may be attributed to him. *United States v. Orlando*, 281 F.3d 586, 600 (6th Cir. 2002). But even if the defendant could reasonably foresee conduct in furtherance of the conspiracy, the loss from that conduct will only be attributed to the defendant if the conduct falls within the scope of his particular agreement. *See Campbell*, 279 F.3d at 400.

Here, Harris does not contest the calculation of $15.6 million in loss resulting from conduct in furtherance of the conspiracy as a whole, nor does he contest the reasonable foreseeability of that conduct. His argument is limited to the district court's attribution of the total loss amount to him. Harris contends the district court failed to make a finding regarding the

scope of his agreement, and that there was no evidence that he agreed to the full scope of the conspiracy.

At sentencing, the district court acknowledged the requirement that it determine whether Harris agreed to jointly undertake the entire scope of the criminal activity. The district court then identified the Companies as criminal enterprises and reviewed the different roles played by Kevin, Starr, and Harris. It considered Harris's claim that he acted under his brother's direction, but found that Harris knew the funds were fraudulently obtained, and that although Kevin and Starr made the initial false promises to investors through solicitations, Harris managed the financial side of the fraud. Thus, the court concluded, Harris knowingly played a critical and material role in the success of the scheme. Although mere knowledge of a scheme's scope does not establish agreement, *Campbell*, 279 F.3d at 400, an active and fundamental role in a fraud can establish an agreement to undertake the entire scheme. *See Kennedy*, 714 F.3d at 961 (holding defendants responsible for the losses of a fraudulent scheme when they "fully participated in the fundamental aspect of the scheme").

On appeal, Harris argues that the district court did not expressly find that Harris agreed to the entire fraud. But, even if the district court's explanation of its decision to hold Harris responsible for the entire loss amount was less than optimal, findings about a defendant's conduct can show the scope of his agreement. *See, e.g.*, *United States v. Nazzal*, 607 F. App'x 451, 460 (6th Cir. 2015) (holding findings about defendant's significant role in the conspiracy sufficient); *United States v. Valentine*, 553 F. App'x 591, 597 (6th Cir. 2014) (holding the district court's findings "substantially compl[ied]" with the scope requirement when findings "evidenc[ed] his scope of consent"); *United States v. Jackson*, 308 F. App'x 899, 907 (6th Cir. 2009) (holding findings about the extent of defendant's involvement in the conspiracy

sufficient); *United States v. Elias*, 107 F. App'x 634, 638 (6th Cir. 2004) (holding the district court "substantially complied" with the scope requirement when it found conduct from which an implicit agreement could be inferred).

The district court's loss determination was adequately supported by findings addressing Harris's involvement in the scheme. The district court relied on the following: Employees of the Companies stated that Kevin and Harris ran the businesses together; although Harris claims he served as president and CEO of I-3 in name only, at the very least, he was involved in its creation and maintained signatory authority; bank employees stated that Harris personally opened all of the Companies' accounts, managed all of the transactions, and represented himself as the owner of the business; Harris's financial responsibilities included making payments to old investors out of new investors' deposits and distributing customer funds for purposes other than investment; when investors inquired about payments, Harris misled them. These findings are not clearly erroneous and support the ultimate conclusion that Harris agreed to jointly undertake the Companies' fraudulent activities along with Kevin and Starr. Thus, the district court did not err by applying a twenty-level amount-of-loss enhancement.

**B.**

Harris next challenges the district court's application of a six-level enhancement for 308 victims. U.S.S.G. § 2B1.1(b)(2)(C). We review de novo the legal conclusion whether a person qualifies as a victim. *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012). Harris identifies two flaws in the district court's number-of-victims calculation. First, Harris repeats his argument that the district court failed to make the required finding about the scope of his agreement. We reject this argument for the reasons already discussed. Second, Harris argues his conduct did not proximately cause the victims' losses. The Guidelines define victim to include

"any person who sustained any part of the actual loss," and actual loss is defined to mean "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. nn.1, 3(A)(i). Harris contends the Sentencing Commission incorporated a proximate-cause standard when it adopted the "resulted from" language in the definition of actual loss, citing a discussion of "legal causation" in the Commission's explanation accompanying the amendment. U.S.S.G. app. C, vol. II, at 178. He does not challenge the district court's identification of 308 persons sustaining pecuniary harm, only whether he caused that harm.

Harris is correct insofar as he asserts the determination of actual loss requires more than factual but-for causation. *See United States v. Peppel*, 707 F.3d 627, 643–44 (6th Cir. 2013). But the Commission's discussion of "legal causation" is in reference to the adoption of reasonable foreseeability as the rule for actual loss. The explanation provides:

> The amendment defines "actual loss" as the "reasonably foreseeable pecuniary harm" that resulted from the offense. The amendment incorporates this causation standard that, at a minimum, requires factual causation (often called "but for" causation) and provides a rule for legal causation (*i.e.*, guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination). Significantly, the application of this causation standard in the great variety of factual contexts in which it is expected to occur appropriately is entrusted to sentencing judges.

U.S.S.G. app. C, vol. II, at 178. In short, actual loss includes the concept of legal causation, but the definition—"the reasonably foreseeable pecuniary harm that resulted from the offense"— provides the standard. Thus, Harris's causation argument challenges whether the harm was reasonably foreseeable to him. The district court found that Harris could reasonably foresee the 308 victims' losses because he had "a fundamental, material, and knowledgeable role in the conspiracy." R. 57, Sentencing Tr., PID 446–47. The district court reviewed Harris's conduct, "what he was doing with the money, transferring, wiring, using it for his own personal purposes," and cited evidence that he "knew everything that was going on." *Id.* at PID 446.

These findings established that Harris "reasonably should have known" loss to the 308 victims was "a potential result of the offense" he agreed to commit. U.S.S.G. § 2B1.1 cmt. n.3(A)(iv). Thus, the district court did not err by applying a six-level number-of-victims enhancement.

**C.**

In his third claim of procedural error, Harris challenges the district court's failure to address and grant a mitigating-role adjustment. U.S.S.G. § 3B1.2. Because the mitigating-role adjustment is rooted in relative culpability, *see, e.g.*, *United States v. Gabbard*, 586 F.3d 1046, 1052 (6th Cir. 2009), a defendant's role is compared to that of other participants, defined as "person[s] who [are] criminally responsible for the commission of the offense." U.S.S.G. § 3B1.1 cmt. n.1. The decision to apply an adjustment "is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." *Id.* § 3B1.1 cmt. n.3(C). For that reason, we review the denial of a mitigating-role reduction for clear error. *United States v. Randolph*, 794 F.3d 602, 616 (6th Cir. 2015).

Harris argues he requested a mitigating-role adjustment in his sentencing memorandum, and the district court improperly failed to make a finding. This aspect of his claim was not preserved. Before calculating Harris's guideline range, the district court stated there would be no mitigating-role adjustment; and, complying with *United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004), at the conclusion of sentencing, the district court asked whether either party had any further objections. Harris did not object to the court's asserted failure to adequately address his request. In any event, the district court acknowledged that a mitigating-role adjustment was requested and made findings about his role. The court explained that Harris had a "fundamental, material, and knowledgeable role" in the conspiracy, R. 57, Sentencing Tr., PID 446, and was "more than just a bystander" because he was "critical and material to the success of the

conspiracy." *Id.* at PID 444; *cf. United States v. Skinner*, 690 F.3d 772, 783 (6th Cir. 2012) (noting the defendant's "role in the conspiracy was critical to its success"). Harris's conduct establishes that the denial of an adjustment was not clearly erroneous.

**IV.**

Harris next argues his below-Guidelines sentence is substantively unreasonable. We "apply a deferential abuse-of-discretion review" to this claim. *United States v. Solano-Rosales*, 781 F.3d 345, 355–56 (6th Cir. 2015). This review "take[s] into account the totality of the circumstances," *United States v. Ushery*, 785 F.3d 210, 223 (6th Cir. 2015) (quoting *Gall*, 552 U.S. at 51), and the "inquiry is governed by the factors set out in 18 U.S.C. § 3553(a)," *Robinson*, 778 F.3d at 519. A below-Guidelines sentence is presumptively reasonable. *United States v. Pirosko*, 787 F.3d 358, 374 (6th Cir. 2015) ("Sentences within a defendant's Guidelines range are presumptively substantively reasonable, a presumption that naturally extends to sentences below the Guidelines range."); *United States v. Sierra-Villegas*, 774 F.3d 1093, 1103 (6th Cir. 2014) ("The district court imposed a below-guidelines sentence, and such sentences are presumptively reasonable."). Thus, "[a]lthough it is not impossible to succeed on a substantive-reasonableness challenge to a below-guidelines sentence, defendants who seek to do so bear a heavy burden." *United States v. Greco*, 734 F.3d 441, 450 (6th Cir. 2013).

Harris contends his below-Guidelines sentence is unreasonable because it is disproportionate to the seriousness of his offense, greater than necessary to conform to § 3553(a), and results in a sentencing disparity. Relying on national sentencing data compiled by the Sentencing Commission, he argues his sentence is inconsistent with the general practice of district courts. Based on his analysis of the Commission's 2013 data, the average sentence for a defendant who pleaded guilty to an offense without a mandatory minimum and received a

twenty-level amount-of-loss enhancement was sixty-two months. Separately, he calculates that between 2006 and 2012 the average sentence for a fraud defendant with a criminal history category of IV was thirty-six months. Harris argues these figures show that his sentence is greater than necessary to achieve the goals of § 3553(a)(2) (sentencing courts are to consider "the need for the sentence imposed" in light of the "seriousness of the offense") and also demonstrate an undue sentencing disparity under § 3553(a)(6) (sentencing courts are to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). However, assuming Harris's statistical analysis is correct, his figures on twenty-level enhancements and category IV criminal histories were compiled separately and fail to account for the fact that he is charged with both the category IV criminal history and the twenty-level enhancement, and with other enhancements as well.

Further, the district court explained why a 120-month sentence comports with § 3553(a)(2). The court noted Harris's previous fraud convictions and expressed surprise at seeing Harris return to federal court. Harris was still on supervised release when the instant criminal conduct began in 2006. This criminal history distinguished Harris from Kevin, who received a lesser sentence in a different court. Although Harris argued he was manipulated by Kevin, the district court observed that Harris "got the benefit of being involved," including "a lot of traveling," the receipt of "a lot of good things," and "living pretty much the high life." R. 57, Sentencing Tr., PID 457–59. Accordingly, the court determined a 120-month sentence would be fair under § 3553(a)(2). Lastly, we have held that § 3553(a)(6) is "an improper vehicle" for challenging a within-Guidelines sentence because the Guidelines address the statutory purpose of combatting disparity. *United States v. Volkman*, 797 F.3d 377, 400 (6th Cir. 2015). Harris's

assertion that his below-Guidelines sentence creates a disparity is therefore misplaced.  Harris

has not met the heavy burden of rebutting the reasonableness of his below-Guidelines sentence.

**V.**

For these reasons, we **AFFIRM**.