RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0274p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DAVID DONADEO,

*Defendant-Appellant*.

No. 17-4295

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:13-cr-00210-1—Benita Y. Pearson, District Judge.

Argued: December 5, 2018

Decided and Filed: December 18, 2018

Before: CLAY, McKEAGUE, and BUSH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Claire R. Cahoon, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Toledo, Ohio, for Appellant. Rebecca C. Lutzko, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Claire R. Cahoon, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Toledo, Ohio, for Appellant. Rebecca C. Lutzko, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. Defendant David Donadeo appeals the district court's December 7, 2017 order sentencing him to a 70-month term of imprisonment and a 3-year term of supervised release following his guilty plea to charges of conspiracy to commit mail fraud, in

violation of 18 U.S.C. §§ 1341, 1349, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). For the reasons set forth below, we **AFFIRM** the district court's sentence.

## BACKGROUND

### Factual Background

This case arises out of a four-year scheme to defraud the Cuyahoga Heights School District (the "District") in northern Ohio. From 2007 to 2011, a group of individuals led by District employee Joseph Palazzo defrauded the District of approximately $3.3 million. From 2009 to 2011, Defendant was part of this group.

The scheme to defraud the District worked as follows. Joseph Palazzo was the District's Information Technology ("IT") Director, and in that capacity had the authority to purchase IT-related goods and services for the District from outside vendors. Any purchase that cost less than $10,000 required only Joseph Palazzo's approval. He would submit an invoice to the District, and the District would issue a check to the vendor.

Joseph Palazzo abused this authority by submitting fake invoices to the District. The fake invoices purported to be for IT-related goods and services purchased from legitimate vendors. However, the vendors were in fact shell corporations that never supplied goods or services of any kind to the District. Nevertheless, because only Joseph Palazzo's approval was required, the District issued checks to these shell corporations based on the fake invoices. These shell corporations were established and owned by Dominick Palazzo (Joseph's brother), Dennis Boyles, and Defendant.

Dominick Palazzo was the first to join in the scheme in 2007. He established and owned two shell corporations—"Forte Promotions" and "Laptops and More." (RE 46, Pre-Sentence Report, PageID # 291.)[1] From 2007 to 2011, these corporations deposited checks from the District totaling $2,156,331.36. Dennis Boyles was the second to join in the scheme in 2008, after being recruited by Dominick Palazzo. He established and owned one shell corporation—

---

[1]Unless otherwise indicated, all record citations refer to the record in district court action No. 13-cr-00210.

"Macwin-Protocol." (*Id.*) From 2008 to 2011, this corporation deposited checks from the District totaling $260,167.22. Defendant was the third to join in the scheme in 2009, after also being recruited by Dominick Palazzo. He established and owned one shell corporation—"DDR Technologies." (*Id.* at PageID # 290–91.) From 2009 to 2011, this corporation deposited checks from the District totaling $648,035.37. Additionally, Dominick Palazzo and Defendant established and owned one shell corporation jointly—"Impact Global," doing business as "The Jump Yard." (*Id.* at PageID # 292.) From 2009 to 2011, this corporation deposited checks from the District totaling $268,913.40.

Thus, all told, the group led by Joseph Palazzo used five shell corporations to defraud the District of approximately $3.3 million over the course of four years.

Defendant's involvement in the scheme stems from his friendship with Dominick Palazzo. The two first met while Defendant was a student at the University of Akron in the early 1990s. And though Defendant subsequently moved to California to pursue an acting career, they remained close. By late 2008, however, Defendant's acting pursuits had proved fruitless, and he and his family—a wife and two young children—were in dire financial straits. Facing foreclosure on their home, Defendant was overwhelmed with anxiety about their future, and soon relapsed into an alcohol addiction. It is at this time that Dominick Palazzo visited Defendant, and invited him to join in the scheme to defraud the District.

According to Defendant, Dominick Palazzo told Defendant about Joseph Palazzo's IT position with the District, and said that he and Joseph "had partnered together to provide [IT] services to the District through a third-party company two years ago." (RE 48, Defendant's Sentencing Memorandum, PageID # 320.) Dominick Palazzo explained that "since Joseph was in charge of the outsourcing, and was qualified to do the work himself, it was an opportunity for everyone to make extra money." (*Id.*) Joseph "completed the work, prepared the invoice, submitted it to the District, and then collected the money," which they split between themselves. (*Id.*)

Dominick Palazzo then offered to "share this opportunity" with Defendant. (*Id.*) All Defendant needed to do was "open a company so that Joseph could outsource the District's IT needs to that company." (*Id.*) Joseph would then "provide the services, prepare the invoices, ensure the District made payment, and then spit the profits with [Defendant] once payment was received." (*Id.*) Though Defendant knew from the outset that this arrangement "presented a potential conflict of interest between Joseph and the District," he maintains that he believed it to be legal. (*Id.* at PageID # 321.) Thus, he agreed.

In January 2009, Defendant incorporated DDR Technologies, opened a corporate bank account, and began depositing checks from the District for IT-related goods and services that DDR Technologies was not providing. Each time the District issued a check, Joseph Palazzo retrieved it, delivered it to Defendant, and told Defendant how much money he could keep and how much money was to be returned to Joseph—typically 50%. Defendant deposited the check, returned the agreed upon amount, and then issued an IRS Form 1099 Statement falsely indicating that Joseph Palazzo had performed services for DDR Technologies in exchange for payment in that amount. At least 73 checks were ultimately issued from the District to DDR Technologies in this manner, all while Defendant remained in California.[2]

Later in 2009, at the urging of Dominick Palazzo, Defendant moved to Ohio. Defendant and Dominick Palazzo then established a jointly-operated corporation called Impact Global, doing business as The Jump Yard. Dominick Palazzo incorporated Impact Global, both he and Defendant opened a corporate bank account, and Defendant was purportedly set to manage The Jump Yard's day-to-day operations. The Jump Yard was a legitimate children's recreational center through which Defendant and Dominick Palazzo laundered funds that Impact Global received from the District. At least 30 checks were ultimately issued from the District to Impact Global in the same manner as with DDR Technologies.

To the extent that Defendant had any doubts about the legality of this scheme, they were admittedly resolved once Defendant moved to Ohio in late 2009 to help establish Impact Global.

---

[2]The checks to the other shell corporations then involved in the scheme—Forte Promotions, Laptops and More, and Macwin-Protocol—were issued from the District in the same manner, with the exception that Dennis Boyles did not issue IRS Form 1099 Statements to Joseph Palazzo.

While in California, Defendant "had limited personal interaction with the Palazzo brothers," and it was "easy for [them] to ignore" any of his requests for "information regarding the IT services being provided to the District." (*Id.* at PageID # 322.) However, "once [Defendant] was in Ohio and working more closely with the Palazzo brothers, [they] were no longer able to conceal what was actually occurring from [Defendant] . . . . [Defendant] now learned that no IT services were being provided to the District." (*Id.*) Rather, "the money [was] being stolen from the District [and] had been put in his companies' bank accounts." (*Id.*)

Nevertheless, Defendant continued to participate in the scheme to defraud the District until the scheme was discovered in February 2011. At that time, Joseph Palazzo was suspended from his IT position with the District pending an internal investigation, and the entire group—the Palazzo brothers, Dennis Boyles, and Defendant—met at Joseph Palazzo's house to discuss how to respond to the inevitable police investigation. Once that investigation was underway, Defendant purportedly began to believe that Dominick Palazzo posed a threat to him and his family. According to Defendant, Dominick Palazzo called him and his wife regularly "to check on him—to see where he was and what he was doing," and told him that "if anybody talks they will pay the price." (*Id.* at PageID # 324.) This led Defendant to fear that "[e]ven if [he] did not cooperate [with the police investigation] . . . Dominick could one day presume he was cooperating and seek revenge." (*Id.* at PageID # 325.)

In June 2011, ten days before search warrants were executed on The Jump Yard as well as on the residences of Defendant and the Palazzo brothers, Defendant sold his interest in The Jump Yard and moved with his family to North Carolina, where they had purchased a bar and restaurant. In August 2011, Defendant abandoned the bar and restaurant and moved with his family to Germany—where Defendant's mother-in-law resided. At this point Defendant cut off all communications with his immediate family in the United States, and there are no records of Defendant obtaining employment in Germany, using a credit card in Germany, or registering housing in Germany. A few months later, Defendant again moved with his family, this time to Spain. At this point, Defendant cut off all communications with his attorney in the United States, who had been asked by the government to negotiate Defendant's return, and there are no records of Defendant obtaining employment in Spain, using a credit card in Spain, or registering

housing in Spain.   Defendant also cancelled a planned flight back to the United States. Defendant purportedly relocated to North Carolina out of fear of physical harm from Dominick Palazzo, to Germany in order to care for his ailing mother-in-law, and to Spain on the recommendation of a friend about the cost-of-living and quality of life there.

While abroad, Defendant was aware that Joseph Palazzo, Dominick Palazzo, and Dennis Boyles were all arrested and charged with various criminal offenses due to their involvement in the four-year scheme to defraud the District.  All subsequently pled guilty. Defendant was also aware that he had been charged with similar offenses.  But it was not until September 2016— three years and five months after those charges were filed against him—that Defendant was arrested.  And in May 2017, he was extradited from Spain to answer them.

## Procedural History

Defendant had been indicted by a grand jury in the Northern District of Ohio in April 2013.  He was charged with one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341, 1349, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  Defendant pled guilty to both charges without a plea agreement.

Defendant's pre-sentence report ("PSR") calculated his Sentencing Guidelines range based on a Total Offense Level of 26.  The PSR began with a Base Offense Level of 7, and Defendant then received a 16-level increase for the amount of pecuniary loss that resulted from his offenses—$2,615,927.  Defendant also received three separate, two-level increases for using sophisticated means in his offenses, laundering money, and obstruction of justice.  After a three-level decrease for accepting responsibility for his offenses, Defendant's Total Offense Level was 26.  This, combined with his Criminal History Category of I, produced a Guidelines range of 63–78 months in prison.

Defendant raised three objections to the PSR: (1) that he should have only received a 14-level increase for the amount of loss that resulted from his offenses—$916,948.77, (2) that he should have received a two-level decrease for playing only a minor role in the offenses, and (3) that he should not have received a two-level increase for obstruction of justice.  At the sentencing hearing, the district court overruled all three objections.  The district court then

sentenced Defendant to a 70-month term of imprisonment and a 3-year term of supervised release.

This appeal followed.

## DISCUSSION

### I.        Standard of Review

We review a defendant's sentence for reasonableness, using an abuse-of-discretion standard.  *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008). "Reasonableness review has both substantive and procedural components."  *United States v. Keller*, 498 F.3d 316, 322 (6th Cir. 2007).   The procedural component requires us to ensure that the district court: "(1) properly calculated the applicable advisory Guidelines range; (2) considered the other § 3553(a) factors as well as [arguments for a sentence outside the range]; and (3) adequately articulated its reasoning for imposing the particular sentence chosen."  *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007).

In evaluating the procedural reasonableness of a defendant's sentence, "we review a district court's findings of fact for clear error and its legal conclusions *de novo*." *United States v. Angel*, 576 F.3d 318, 320 (6th Cir. 2009).  Accordingly, whether conduct constitutes "relevant conduct" under Guidelines § 1B1.3(a)(1)(B) is reviewed *de novo*, while the underlying factual findings regarding whether that conduct is "within the scope" of, "in furtherance" of, and "reasonably foreseeable" in connection with jointly undertaken criminal activity are reviewed for clear error.  *United States v. Tocco*, 306 F.3d 279, 284 (6th Cir. 2002).  Similarly, whether conduct constitutes "obstruction of justice" under Guidelines § 3C1.1 is reviewed *de novo*, while any underlying findings of fact regarding that conduct are reviewed for clear error.  *United States v. Amerson*, 886 F.3d 568, 578 (6th Cir. 2018).  A finding of fact is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. Charles*, 138 F.3d 257, 262 (6th Cir. 1998).

However, where a procedural reasonableness issue has not been preserved for appeal, we review only for plain error. *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010). Plain error exists where there is "(1) error (2) that was 'obvious or clear,' (3) that 'affected [the] defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Vonner*, 516 F.3d 384, 386 (6th Cir. 2008) (en banc) (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)). Accordingly, plain error is a standard that is extremely deferential to the district court, and it should be found "sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice." *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 483 (6th Cir. 1999) (quoting *United States v. Hook*, 781 F.2d 1166, 1172–73 (6th Cir. 1986)).

## II.  Analysis

On appeal, Defendant argues that his sentence is procedurally unreasonable because the district court (1) improperly determined the amount of loss attributable to him pursuant to Guidelines §§ 2B1.1(b), 1B1.3(a)(1)(B), and (2) improperly applied an obstruction of justice enhancement to him pursuant to Guidelines § 3C1.1. We address each argument in turn.

### A.  The amount of loss attributable to Defendant pursuant to Guidelines §§ 2B1.1(b), 1B1.3(a)(1)(B)

A defendant's Guidelines range is based on his/her Criminal History Category and Total Offense Level. U.S.S.G. ch. 5, pt. A (sentencing table). And a defendant's Total Offense Level is based on his/her Base Offense Level and any increases or decreases warranted by the circumstances surrounding the offense. *Id.* § 1B1.1(a). Where a defendant has committed a fraud-related offense, his/her Total Offense Level is increased in proportion to the amount of pecuniary loss that resulted from it. *Id.* § 2B1.1(b).

In this case, the district court applied a 16-level increase to Defendant's Total Offense Level after determining that the amount of loss attributable to Defendant was approximately $2.6 million. *See* U.S.S.G. § 2B1.1(b)(1)(I)–(J). Defendant asserts that that determination was improper for three reasons: (1) the district court erroneously attributed to him the amount of loss that resulted from the shell corporations established and owned by Dominick Palazzo and Dennis

Boyles, (2) the district court failed to make sufficient factual findings in attributing that loss to him, and (3) the district court applied the wrong legal standard in attributing that loss to him.  We disagree.

### 1.   The amount of loss that resulted from the shell corporations established and owned by Dominick Palazzo and Dennis Boyles

In determining the amount of loss attributable to a defendant pursuant to Guidelines § 2B1.1(b), the district court may consider any "relevant conduct."  U.S.S.G. § 1B1.3(a); *United States v. Hodge*, 805 F.3d 675, 678–79 (6th Cir. 2015).  Relevant conduct includes:

> (A) all [criminal] acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant, and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were--
>
>> (i) within the scope of the jointly undertaken criminal activity,
>> (ii) in furtherance of that criminal activity, and
>> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1); *Hodge*, 805 F.3d at 678–79.  Accordingly, the amount of loss attributable to a defendant may include any loss that resulted from his/her own criminal conduct, as well as any loss that resulted from certain conduct of others.  *United States v. Kennedy*, 714 F.3d 951, 960–61 (6th Cir. 2013).  Conduct of others "that meets all three criteria set forth in subdivisions (i) through (iii)"—*i.e.* is "within the scope" of, "in furtherance" of, and "reasonably foreseeable" in connection with jointly undertaken criminal activity—"is relevant conduct under this provision" for which a defendant may be held accountable.  U.S.S.G. § 1B1.3 cmt. n.3(A).

To ensure that these criteria are met in a given case, the district court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake."

U.S.S.G. § 1B1.3 cmt. n.3(B).**3**  Significantly, this "is not necessarily the same as the scope of the entire conspiracy," nor is it necessarily the same as the scope of conduct for which a defendant can be held accountable under the criminal law of conspiracy.**4**  *Id*.  Rather, it is limited to "the scope of the specific conduct and objectives embraced by the defendant's agreement." *Id*.  "[A]ny explicit agreement [and any] implicit agreement fairly inferred from the conduct of the defendant and others" may be considered.  *Id*.  After the district court has determined in this manner the scope of the criminal activity that the particular defendant agreed to jointly undertake, it must then proceed to determine if the conduct of others at issue was "in furtherance" of that activity and "reasonably foreseeable" in connection with that activity.

This Court has not had occasion to provide much additional guidance about these criteria, particularly the requirement that the conduct of others at issue be "within the scope" of the criminal activity the particular defendant agreed to jointly undertake.  Rather, our opinions on that requirement have often simply noted the case-specific facts relied upon in reaching their conclusions.  We now take the opportunity to state more clearly what is relevant when determining whether that requirement has been satisfied, and because our precedent is of limited utility, we look to helpful cases from other circuits.

In *United States v. Salem*, the Seventh Circuit held that the amount of loss loss that resulted from wire fraud committed by the defendants' co-conspirators could be attributed to the defendants.  657 F.3d 560, 565 (7th Cir. 2011).  And in doing so, the court listed factors relevant

---

**3**"A district court must calculate a defendant's Guidelines range correctly, and in doing so, account for all applicable commentary." *United States v. Havis*, 907 F.3d 439, 444 (6th Cir. 2018).

**4**The latter distinction is important, if not intuitive.  Just because a defendant could be convicted for a substantive offense committed by another on the basis of the criminal law of conspiracy does *not* automatically mean that his/her sentence for the conspiracy offense itself can take into account the conduct underlying that substantive offense.  The latter inquiry is "narrower than" the former.  *United States v. Swiney*, 203 F.3d 397, 399 (6th Cir. 2000).  For instance, a defendant cannot be held accountable under § 1B1.3(a)(1)(B) for "the conduct of [other] members of a conspiracy prior to the defendant joining the conspiracy." U.S.S.G. § 1B1.3 cmt. n.3(B).  But "it has long been established [under the criminal law of conspiracy] that a conspirator may join a conspiracy already in progress and be held responsible for actions done in furtherance of the conspiracy before he joined." *United States v. Collins*, 799 F.3d 554, 579 (6th Cir. 2015) (quotation omitted).  In the same way, a defendant cannot be held accountable under § 1B1.3(a)(1)(B) for "[a]cts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant" and committed in furtherance of the conspiracy.  U.S.S.G § 1B1.3 cmt. n.3(B).  And this is true even though "[c]onspirators are generally held liable [under the criminal law of conspiracy] for [all] known or reasonably foreseeable acts of their co-conspirators committed in furtherance of the conspiracy." *United States v. Walton*, 908 F.2d 1289, 1299 (6th Cir. 1990).

to determining the scope of the criminal activity that a defendant agreed to jointly undertake, including: "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme." *Id.* at 564 (internal citations omitted). Other circuits have articulated similar factors. *See, e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1005 (9th Cir. 2010); *United States v. Spotted Elk*, 548 F.3d 641, 675 (8th Cir. 2008); *United States v. Studley*, 47 F.3d 569, 576 (2d Cir. 1995). And without articulating them, we have frequently relied on similar factors.[5] Thus, we adopt the factors listed by the Seventh Circuit in *Salem* to determine the scope of the criminal activity that a defendant agreed to jointly undertake.

In this case, Defendant asserts that he cannot be held accountable for the conduct of Dominick Palazzo and Dennis Boyles because their shell corporations were not within the scope of the criminal activity that he agreed to jointly undertake. In support of this assertion, Defendant contends that he was "never involved" with those corporations, "never agreed to participate in criminal activity involving" those corporations, and had "no independent knowledge of the operations of" those corporations. (Brief for Appellant at 14–15; Reply Brief for Appellant at 3.) Rather, Defendant contends that he only agreed to establish and own DDR Technologies and Impact Global, and that any other shell corporations involved in the scheme to defraud the District accordingly fall outside the scope of that narrow agreement. But this assertion is ultimately unpersuasive, as the factors listed in *Salem* support the district court's finding that the scope of Defendant's jointly undertaken criminal activity was broad enough to include the conduct of Dominick Palazzo and Dennis Boyles.

---

[5]*See, e.g.*, *United States v. Agundiz-Montes*, 679 F. App'x 380, 390 (6th Cir. 2017) (relying on the defendant's knowledge of the scope of the scheme); *United States v. Carmichael*, 676 F. App'x 402, 407 (6th Cir. 2017) (relying on the length and degree of the defendant's participation in the scheme, the defendant's knowledge of the scope of the scheme, and on the coordination of activities among schemers); *United States v Harris*, 636 F. App'x 922, 926 (6th Cir. 2016) (relying on the length and degree of the defendant's participation in the scheme); *United States v. Kennedy*, 714 F3d 951, 961 (6th Cir. 2013) (relying on the length and degree of the defendant's participation in the scheme, and on the pooling of resources or profits); *United States v. Jackson*, 308 F. App'x 899, 907 (6th Cir. 2009) (relying on the existence of a single scheme); *United States v. Smith*, 239 F. App'x 162, 167 (6th Cir. 2007) (relying on the existence of a single scheme); *United States v. Elias*, 107 F. App'x 634, 638 (6th Cir. 2004) (relying on similarities in *modus operandi*); *United States v. Drummer*, 225 F.3d 660, at *3 (6th Cir. 2000) (Table) (relying on similarities in *modus operandi*); *United States v. Nallie*, 53 F.3d 332, at *3 (6th Cir. 1995) (Table) (relying on the pooling of resources or profits).

*(1) The existence of a single scheme.* The scheme to defraud the District had a single, unlawful objective—to obtain as much money from the District as possible. (RE 46, PageID # 288) ("From 2007 to February 14, 2011, Joseph Palazzo and others conspired and executed a fraud scheme to steal approximately $3,300,000 from the [District]."); (RE 48, PageID # 320) ("Dominick continued by informing [Defendant] that . . . it was an opportunity for everyone to make extra money. . . . Dominick then offered to share this opportunity with [Defendant]."). Thus, this factor supports a finding that the scope of Defendant's jointly undertaken criminal activity was broad enough to include the conduct of Dominick Palazzo and Dennis Boyles. *Accord* U.S.S.G. § 1B1.3 cmt. n.3(B) ("[T]he [district] court must first determine . . . the scope of the specific conduct *and objectives* embraced by the defendant's agreement.") (emphasis added); *United States v. Jackson*, 308 F. App'x 899, 907 (6th Cir. 2009) ("[The defendants] were still working towards a *common goal* of the criminal conspiracy . . . .") (emphasis added); *United States v. Smith*, 239 F. App'x 162, 167 (6th Cir. 2007) ("Selling crack was not one of several illegal ends sought by the [conspiracy]—it was *the end*.") (emphasis added).

*(2) Similarities in modus operandi.* The group led by Joseph Palazzo all defrauded the District in the exact same manner—by establishing and owning shell corporations that purported to provide IT-related goods and services to the District. (RE 46, PageID # 289) ("Regularly, Joseph Palazzo retrieved the checks from the [D]istrict, which were made payable to the [shell corporations], and delivered them either to [Defendant], Dominick Palazzo, or [Dennis] Boyles. Each time he did so, Joseph Palazzo told [Defendant] or those individuals how much of the money to keep for their own personal use and how much money to return to Joseph Palazzo, via check or cash, for his personal use."). In the case of Defendant and Dominick Palazzo, they then also issued IRS-Form 1099 Statements to Joseph Palazzo falsely indicating that Joseph had performed services for their shell corporations in exchange for payment in that amount. Thus, this factor supports a finding that the scope of Defendant's jointly undertaken criminal activity was broad enough to include the conduct of Dominick Palazzo and Dennis Boyles. *Accord United States v. Elias*, 107 F. App'x 634, 638 (6th Cir. 2004) ("[The defendants] 'all did the same thing with the same checks gotten [sic] them from the same place with the same IDs, cashed at the same bank.' . . . The acts of entering the banks together and cashing fraudulent checks as a group also provide the basis for finding an implicit agreement among [the

defendants].") (citation omitted); *United States v. Drummer*, 225 F.3d 660, at *3 (6th Cir. 2000) (Table) ("[The defendants] were each engaged in a common scheme to defraud [the bank] using the same method . . . . [They were] engaged in 'basically the same scheme' involving the same bank.") (citation omitted).

*(3) Coordination of activities among schemers.*   The scheme to defraud the District required at least some coordination among all of the co-conspirators.   Dominick Palazzo instructed Defendant on how join in the scheme.  (RE 48, PageID # 320) ("Dominick explained that all [Defendant] needed to do was open a company so that Joseph could outsource the District's [IT] needs to that company.").   Later, Defendant and Dominick Palazzo jointly established and owned Impact Global, doing business as The Jump Yard. (RE 46, PageID # 289) ("Beginning in approximately the spring of 2009, [Defendant] and Dominick Palazzo used the[ir] stolen funds to make preparations to start and operate The Jump Yard . . . [in order] to conceal the illegal nature of receiving said funds and to avoid detection by law enforcement."). All of the individuals involved coordinated with Joseph Palazzo in order to receive the checks from the District, as described above.  And once the scheme was discovered, the entire group— the Palazzo brothers, Dennis Boyles, and Defendant—all met at Joseph Palazzo's house to discuss how to respond to the inevitable police investigation. Thus, this factor supports a finding that the scope of Defendant's jointly undertaken criminal activity was broad enough to include the conduct of at least Dominick Palazzo, and likely also Dennis Boyles.  *Accord United States v. Carmichael*, 676 F. App'x 402, 407 (6th Cir. 2017) ("[One conspirator] provided instructions to his coconspirators about obtaining various identifications and opening fraudulent bank accounts. . . . [Defendant then] opened a number of fraudulent bank accounts . . . .").

*(4) Pooling of resources or profits.*  Dominick Palazzo used $100 from one of his shell corporations to open the corporate bank account for Impact Global, the shell corporation that he and Defendant jointly established and owned.   Defendant and Dominick Palazzo then both deposited checks from the District into that bank account and used that bank account to fund check and debit card purchases related to The Jump Yard.  Thus, this factor supports a finding that the scope of Defendant's jointly undertaken criminal activity was broad enough to include the conduct of Dominick Palazzo, but not Dennis Boyles.  *Accord United States v. Kennedy*,

714 F.3d 951, 961 (6th Cir. 2013) ("[T]he government's evidence showed that [one defendant] deposited into [a joint bank account] one check from [the victim of another defendant] and another check written by [the other defendant] himself."); *United States v. Nallie*, 53 F.3d 332, at *3 (6th Cir. 1995) (Table) ("[T]here is no indication from the record before us . . . that [the defendant] shared resources with [his co-conspirators].").

*(5) Knowledge of the scope of the scheme.* Defendant admittedly knew at the time he joined in the scheme to defraud the District that Dominick Palazzo had established and owned at least one other shell corporation that he was using for that purpose. (RE 48, PageID # 320) ("Dominick went on to explain that he and Joseph had partnered together to provide [IT] services to the District through a third-party company two years ago. . . . Dominick then offered to share this opportunity with [Defendant]."); (RE 46, PageID # 288) ("[Defendant] had knowledge of other shell corporations . . . used by co-conspirators; however [he] claims that he did not have knowledge that the other shell corporations were being used to further advance the scheme."). Thus, this factor supports a finding that the scope of Defendant's jointly undertaken criminal activity was broad enough to include the conduct of Dominick Palazzo, but not Dennis Boyles. *Accord Carmichael*, 676 F. App'x at 407 ("The actions of [the defendants] also indicate that they were fully aware of the scope of the conspiracy."); *United States v. Agundiz-Montes*, 679 F. App'x 380, 390 (6th Cir. 2017) ("[The defendant] was so deeply involved that he would have known the full extent of the heroin distribution.").

*(6) Length and degree of the defendant's participation in the scheme.* Defendant played a "middle of the tier" role in the scheme to defraud the District, and accordingly the district court found that he was entitled to neither a leadership role enhancement nor a minor role reduction at sentencing. (RE 60, Sentencing Hearing Transcript, PageID # 458.) While Defendant was not the architect of the scheme and was the last of the co-conspirators to join in it, he participated for over two years during which he established and owned two shell corporations that were responsible for almost one-third of the total loss that resulted from the entire four-year conspiracy. Thus, this factor supports, if only slightly, a finding that the scope of Defendant's jointly undertaken criminal activity was broad enough to include the conduct of Dominick Palazzo and Dennis Boyles. *Accord Carmichael*, 676 F. App'x at 407 (6th Cir. 2017) ("[One

defendant] 'was at the center of the activity in the United States' . . . . [and the other defendant] was left in charge of the American part of the conspiracy when [the first defendant] was out of town.") (citation omitted); *United States v. Harris*, 636 F. App'x 922, 926 (6th Cir. 2016) ("[A]n active and fundamental role in a fraud can establish an agreement to undertake the entire scheme."); *Kennedy*, 714 F.3d at 961 ("Both [defendants] fully participated in the fundamental aspect of the scheme . . . .").

Thus, all of the factors listed in *Salem* support the district court's finding that the shell corporations established and owned by Dominick Palazzo were within the scope of Defendant's jointly undertaken criminal activity, and a majority of the factors support the same finding with regard to the shell corporation established and owned by Dennis Boyles. Accordingly, we hold that the district court did not err in making these findings.

Defendant also briefly asserts that the shell corporations established and owned by Dominick Palazzo and Dennis Boyles were not reasonably foreseeable in connection with his jointly undertaken criminal activity. But this assertion is equally unpersuasive. As to Dominick Palazzo's shell corporations, Defendant had actual knowledge of at least one at the time he joined in the scheme, and "[a]ctual knowledge necessarily satisfies the lesser reasonable-foreseeability standard." *United States v. Anderson*, 795 F.3d 613, 617 (6th Cir. 2015). Defendant also jointly established and owned a second shell corporation with Dominick Palazzo. Accordingly, it was reasonably foreseeable that Dominick Palazzo had established and owned a second shell corporation that, along with the other two, he was similarly using to defraud the District. *Accord United States v. Doe #2*, 291 F. App'x 268, 270 (11th Cir. 2008) ("It was reasonably foreseeable that [the defendant] was not the only store employee handling stolen merchandise and that additional stolen merchandise, not just that [the defendant] handled personally, would be included in the shipments delivered to New York."). And as to Dennis Boyles' shell corporation, Defendant was recruited to join in the scheme by Dominick Palazzo. Accordingly, it was reasonably foreseeable that Dominick Palazzo had recruited or would in the future recruit others, including Dennis Boyles, to do the same. *Accord United States v. Sorokin*, 570 F. App'x 217, 219 (3d Cir. 2014) ("[The defendant] reasonably could foresee that Kismat

would bring another person to assist him in the fraudulent shopping sprees because [the defendant] himself accompanied and assisted Kismat on several of these trips.").[6]

Thus, we hold that the district court properly found that the amount of loss that resulted from the shell corporations established and owned by Dominick Palazzo and Dennis Boyles is attributable to Defendant. Accordingly, we need not address clear error.

### 2. The district court's factual findings regarding the loss attributable to Defendant

We review Defendant's second assertion for plain error, as it is an alleged procedural error that was not raised before the district court. *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004); *see also United States v. Donohue*, 726 F. App'x 333, 358–59 (6th Cir. 2018).

A district court must "make particularized findings with respect to both the scope of the defendant's agreement [to engage in jointly undertaken criminal activity] *and* the foreseeability of his co-conspirators' conduct before holding the defendant accountable" for that conduct. *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002).

With regard to the scope of a defendant's agreement to engage in jointly undertaken criminal activity, we have found the particularized findings requirement satisfied by a finding that "witnesses testified that the total amount of crack purchased by [the defendant] and his co-conspirators . . . was somewhere between 50 kilograms and 60 kilograms, *a great deal more than 7.5.*" *United States v. Valentine*, 553 F. App'x 591, 597 (6th Cir. 2014) (citation omitted) (second two alterations in original). We have also found the requirement satisfied by a finding that "this was a jointly undertaken criminal activity . . . [based on] the documents that we have received in evidence and on the testimony of Agent Lewis and [on the fact that] your client has

---

[6]Though the foreseeability of the shell corporation established and owned by Dennis Boyles is a close case, any error would also have been harmless, as "either way [Defendant] is subject to the same guideline range." *United States v. Gill*, 348 F.3d 147, 155 (6th Cir. 2003); *see also United States v. Turner*, 738 F. App'x 856, 865 (6th Cir. 2018) ("[W]here a district court errs in its guidelines calculations, remand is appropriate only if the error affected the defendant's guidelines range."). Even excluding the amount of loss that resulted from Dennis Boyles' shell corporation from the amount of loss attributable to Defendant, Defendant would have received the same 16-level increase to his Total Offense Level because the amount of loss attributable to him would still have exceeded $1.5 million. *See also* U.S.S.G. § 2B1.1(b)(1)(I)–(J).

pleaded guilty to a conspiracy count." *United States v. Labib*, 38 F. App'x 257, 261 (6th Cir. 2002).

With regard to the foreseeability of the co-conspirator's conduct, we have found the particularized findings requirement satisfied by a finding that the defendant "was aware that the conspiracy was broader than merely the three transactions with which he was involved and that, as a result, the conduct of the conspiracy as a whole was reasonably foreseeable to him." *Campbell*, 279 F.3d at 400–01. We have also found the requirement satisfied by a finding that the defendant "'was involved in . . . three to five purchases in Arkansas of one to two kilograms per transaction,' and other 'multiple kilogram purchase[s] from Arkansas,'" and that, as a result "this quantity was either known by [the defendant] personally because he was there or was reasonably foreseeable to him." *Valentine*, 553 F. App'x at 597. (citation omitted) (first two alterations in original).

In this case, the district court made similar factual findings. The district court stated:

Counselors, I've had an opportunity now to hear you in court and I've read what's been written, not only by you, but also by the probation officer, and I find that the objection [to the amount of loss attributable to Defendant] is well placed if I were to believe that [Defendant] didn't know what was happening, and that he didn't know for a much longer period than even the end of 2009. And if I believe that the law requires that I narrowly construe what's jointly taken – jointly undertaken behavior in the way defense counsel suggests, I don't believe I am so constrained. . . .

I do think there is room for argument that you're not to be held for the entire loss amount [of $3.3 million]. The $2.6 million is a portion, is more than 1.5, but I think that greater amount is easily substantiated . . . .

Because while I accept what's written here [in the PSR] and I adopt it as my own, the criminal activity that was jointly undertaken during 2009 to 2011 is appropriately attributed to you, Mr. Donadeo. Even if I were to give you the benefit of the doubt that [the government] isn't urging, but recognizes as a possibility and limited to 2010 to 2011, it still far exceeds the $1.5 million threshold, which would dictate a 16-level upwards adjustment.

What's important in this case is that you did participate, jointly and knowingly, in a criminal conspiracy that created a loss to the victim in excess of $1.5 million.

(RE 60, PageID #442–43.)  Although "less than optimal," these findings were sufficient. *United States v. Harris*, 636 F. App'x 922, 926 (6th Cir. 2016).  The district court addressed both the scope of Defendant's agreement to engage in jointly undertaken criminal activity and the foreseeability of his co-conspirators' conduct.  The district court explained that $2.6 million of loss was attributable to Defendant because he could not be attributed with the $3.3 million of loss that resulted from the entire conspiracy.  And it explained that the $2.6 million of loss was attributable to Defendant because he knew "what was happening" and chose to join in the scheme anyway.  Significantly, that knowledge is relevant to both the scope and foreseeability criteria, as discussed above.  *See Salem*, 657 F.3d at 564; *Anderson*, 795 F.3d at 616–17.

Thus, we hold that the district court made sufficient factual findings in attributing the amount of loss that resulted from the shell corporations established and owned by Dominick Palazzo and Dennis Boyles to Defendant.  Accordingly, we need not address plain error.

### 3.    The district court's legal standard regarding the loss attributable to Defendant

We also review Defendant's third assertion for plain error, as it is an alleged procedural error that was not raised before the district court.  *Bostic*, 371 F.3d at 871.

At sentencing, the government must prove the amount of loss attributable to a defendant, like all sentencing adjustments, by a preponderance of the evidence.  *Wright v. United States*, 182 F.3d 458, 467 (6th Cir. 1999).  Defendant contends that the district court here erroneously applied the lesser "probable cause" standard.  *Accord Smoak v. Hill*, 460 F.3d 768, 778 (6th Cir. 2006) ("[Reasonable suspicion] requires more than just a 'mere hunch,' but is satisfied by a likelihood of criminal activity less than probable cause, and 'falls considerably short of satisfying a preponderance of the evidence standard.'").

It is true that the district court used the phrase "probable cause" when stating its findings regarding the amount of loss attributable to Defendant.  Specifically, the district court stated:

> I think that greater amount [of $2.6 million] is easily substantiated, at least by probable cause, and even clearly—more clearly than that.

(RE 60, PageID # 442.)   However, as the context demonstrates, the district court seemed to understand that a higher standard applied.   And this understanding was made clear later in the sentencing proceeding when the district court stated, in relation to a different objection:

> I'm keeping all of these [arguments] in mind as I develop what I think will be a fair, sufficient sentence to be imposed.   I'm aware of what the guidelines suggest and about the preponderance that usually is required to substantiate an adjustment, and also what I can do by way of exercising a variance.

(*Id.* at PageID # 474.)   Thus, we hold that the district court's use of the phrase "probable cause" was not error.   *Accord Arnett v. Jackson*, 393 F.3d 681, 688 (6th Cir. 2005) ("[A]lthough 'a trial judge on occasion will misspeak during sentencing . . . every ill-advised word will not be the basis for reversible error.'") (alteration in original) (quoting *United States v. Bakker*, 925 F.2d 728, 741 (4th Cir. 1991)); *United States v. Chambliss*, 398 F. App'x 142, 144 (6th Cir. 2010) ("Even in original sentencing proceedings, however, we do not punish district courts for minor omissions or slips of the tongue.").   Accordingly, we need not address plain error.

## B.    Defendant's obstruction of justice enhancement pursuant to Guidelines § 3C1.1

As stated above, a defendant's Sentencing Guidelines range is based on his/her Criminal History Category and Total Offense Level.   U.S.S.G. ch. 5, pt. A (sentencing table).   And a defendant's Total Offense Level is based on his/her Base Offense Level and any increases or decreases warranted by the circumstances surrounding the offense.   *Id.* § 1B1.1(a).   Where a defendant has "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," his/her Total Offense Level is increased by 2 levels.   *Id.* § 3C1.1.

In this case, the district court applied this 2-level increase to Defendant's Total Offense Level after finding that he had obstructed justice by relocating multiple times in order to "evade investigation and prosecution."   (RE 60, PageID # 478.)   Defendant asserts that that application was improper because he "did nothing to avoid detection other than leave the United States with no criminal case pending against him," which does not constitute obstruction of justice.   (Brief for Appellant at 23.)   We disagree.

"Obstructive conduct can vary widely in nature, degree of planning, and seriousness." U.S.S.G. § 3C1.1 cmt. n.3. As a result, "comparison of the examples set forth in Application Notes 4 and 5 [accompanying § 3C1.1] should assist the [district] court in determining whether application of this adjustment is warranted in a particular case." *Id.* Application Note 5 states that "avoiding or fleeing from arrest" does not "ordinarily" constitute obstruction of justice. *Id.* cmt. n.5; *see also United States v. Henry*, 819 F.3d 856, 872 (6th Cir. 2016).

As the word "ordinarily" suggests however, this is not a hard-and-fast rule. Avoidance of or flight from arrest *can* constitute obstruction of justice. But we have yet to adopt a test for distinguishing ordinary avoidance or flight—which does not constitute obstruction of justice— from extraordinary avoidance or flight—which does. Accordingly, we look to helpful cases from other circuits.

Three circuits have held that avoidance of or flight from arrest constitutes obstruction of justice only where there is some additional obstructive conduct. *See, e.g.*, *United States v. Bliss*, 430 F.3d 640, 648–49 (2d Cir. 2005) ("[W]e believe that [the defendant's] flight itself is insufficient to support the district court's application of the enhancement. We therefore look for other 'obstructive conduct' that, 'coupled with' his flight, might allow us to affirm the court's ruling.") (internal citations omitted); *United States v. Alpert*, 28 F.3d 1104, 1107 (11th Cir. 1995) ("We conclude that the § 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest, without more. . . . The [defendants] may have engaged in additional conduct while avoiding arrest, however, that would warrant application of the obstruction enhancement . . . .") (internal citations omitted); *United States v. Madera-Gallegos*, 945 F.2d 264, 267 (9th Cir. 1991) ("'Mere flight in the immediate aftermath of a crime' is not sufficient to apply the § 3C1.1 adjustment. But flight, coupled with other 'obstructive' conduct, may justify the § 3C1.1 enhancement.") (internal citations omitted). But one circuit has recently "set a [lower] bar," holding that avoidance of or flight from arrest constitutes obstruction of justice "if it is likely to burden a criminal investigation or prosecution significantly—likely to make the investigation or prosecution significantly more costly or less effective than it would otherwise have been."

*United States v. Nduribe*, 703 F.3d 1049, 1052–53 (7th Cir. 2013).  Because these cases apply significantly different tests to the same issue, they deserve further discussion.

In *Madera-Gallegos*, the defendant facilitated the sale of heroin to an undercover police officer. 945 F.2d 266–67.  Presumably after realizing that fact, the defendant immediately fled from California to Mexico.  *Id.*  Later that night, a search warrant was executed at the defendant's residence and revealed "the lights on and food cooking on the stove, which indicated . . . that someone had fled in a hurry." *Id* at 266.  Nine months later, the defendant was arresting after returning to the United States to persuade his wife to come to Mexico with him. *Id.*  On these facts, the Ninth Circuit held that an obstruction of justice enhancement was inapplicable.  The court reasoned that the defendant "fled to Mexico immediately after the drug deal turned sour," and that "there [was] no evidence that, once found, [the defendant] made any efforts to impede authorities."  *Id.* at 268.  Thus, there was no "other 'obstructive' conduct" to justify the enhancement.  *Id.* at 267.

And in *Bliss*, the defendant sexually abused his minor niece. 430 F.3d at 642–43.  The police, relying on an anonymous tip, obtained and executed a search warrant at the defendant's residence.  *Id.*  Presumably after realizing that fact, the defendant immediately fled from Vermont to California.  *Id.*  Twelve months later, having been placed on the Federal Bureau of Investigation's Ten Most Wanted List, the defendant was arrested.  *Id.*  While a fugitive, the defendant had used an alias and his appearance had changed.  *Id.*  On these facts, the Second Circuit held that an obstruction of justice enhancement was inapplicable.  The court reasoned that the defendant's actions "amount[ed] to little more than 'simply disappear[ing] to avoid arrest,'" which "fall[s] short of what we believe the Sentencing Commission contemplated in prescribing the enhancement for obstruction of justice." *Id.* at 648 (second alteration in original) (internal citations omitted).  The court further reasoned that the defendant's use of an alias was not "other obstructive conduct" because there was no evidence that it "actually hindered or impeded the investigation or prosecution of the offense," and that the defendant's change in appearance was also not "other obstructive conduct" because there was no evidence that the changes—gaining weight and growing a mustache—were "abnormal" or "calculated and

deliberate." *Id.* at 649–51; *accord United States v. Spates*, 162 F. App'x 592, 596 (6th Cir. 2006) Thus, there was no "other obstructive conduct" to justify the enhancement. *Id.* at 651.

But in *Nduribe*, the defendant was part of a large heroin distribution conspiracy. 703 F.3d at 1050–51. After learning that the police were searching the home of a co-conspirator, the defendant fled from Illinois to New York, Nigeria, and then to Amsterdam. *Id.* Several years later, the defendant was arrested and extradited. *Id.* While a fugitive, and even upon arrest, the defendant had used an alias. *Id.* On these facts, the Seventh Circuit held that an obstruction of justice enhancement was applicable. The court stated that the exception in § 3C1.1 for avoidance of or flight from arrest was "puzzl[ing]" in its lack of regard for the effect of a defendant's actions on the government. *Id.* at 1051. And the court cited to *Bliss* as epitomizing the absurdity of blindly adhering to that approach, questioning "what better example of obstructing justice could one want [than what occurred in *Bliss*]?" *Id.* at 1052. The court then reasoned that the proper test for distinguishing ordinary avoidance or flight from extraordinary avoidance or flight is whether it is "likely to burden a criminal investigation or prosecution significantly—likely to make the investigation or prosecution significantly more costly or less effective than it would otherwise have been." *Id.* at 1052. And that test was "easily satisfied." *Id.*

We adopt the test of the Second, Ninth, and Eleventh circuits, and hold that avoidance of or flight from arrest constitutes obstruction of justice only where there is some additional obstructive conduct. In addition to having been adopted by the majority of circuits to decide the issue, this test finds stronger support in the text of § 3C1.1—which notes the relevance of the effect of a defendant's actions on the government in some contexts, but notably does not do so in others, including avoidance of or flight from arrest. *Compare* U.S.S.G § 3C1.1 cmt. n.4(G), 5(A) *with id.* cmt. n.5(D). This test is also consistent with our holding in *United States v. Sanchez*, 928 F.2d 1450 (6th Cir. 1991), *abrogated on other grounds by United States v. Jackson-Randolph*, 282 F.2d 369 (6th Cir. 2002). In that case, we held, without much explanation, that an obstruction of justice enhancement was inapplicable where the defendants "undoubtedly abandoned their known residence in an attempt to avoid being arrested." *Id.* at 1459. But no additional obstructive conduct was argued or discussed there.

Applying that test to the facts of this case, we hold that Defendant's conduct constituted obstruction of justice. While, as in *Sanchez*, Defendant's relocations to North Carolina, Germany, and Spain were undoubtedly an attempt to avoid being arrested, here there is also other obstructive conduct sufficient to justify the enhancement. After leaving the country, Defendant cut off all communications with his immediate family in the United States, did not obtain employment, did not use a credit card, did not register housing, cancelled a planned flight back to the United States, and eventually, as the government closed in on him, cut off all communications with his attorney in the United States. Though a close case, this conduct is sufficient to justify the enhancement because it was a "calculated" and "deliberate" effort by Defendant to evade arrest, prosecution, and possible conviction for his involvement in the scheme to defraud the District. *Accord Spates*, 162 F. App'x at 596; *Bliss*, 430 F.3d at 651.[7]

Thus, we hold that the district court properly applied an obstruction of justice enhancement pursuant to § 3C1.1.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's sentence.

---

[7]Any error would also have been harmless as "either way [Defendant] is subject to the same guideline range." *United States v. Gill*, 348 F.3d 147, 155 (6th Cir. 2003); *see also United States v. Turner*, 738 F. App'x 856, 865 (6th Cir. 2018) ("[W]here a district court errs in its guidelines calculations, remand is appropriate only if the error affected the defendant's guidelines range."). The district court stated an "in-the-alternative variance" with regard to the obstruction of justice enhancement. ( RE 60, PageID # 481–82.) It is well-established that such a variance renders any error harmless. *See United States v. Steel*, 609 F. App'x 851, 854–55 (6th Cir. 2015) (collecting published Sixth Circuit cases to that effect).