NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0251n.06

No. 20-5973

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | May 21, 2021 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| SERGIO BUCIO, | ) | COURT FOR THE EASTERN |
|  | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) |  |
|  | ) |  |

BEFORE: COLE, BUSH, and NALBANDIAN, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Ciro Macias-Martinez's problem was that he had too much cash. Although his drug sales out of Scott County, Kentucky, were booming, he had no way to launder his growing piles of currency or to repatriate the funds to Mexico. Early attempts to launder money through a bank account succeeded only in arousing the banker's suspicion, which led the bank to close the account.

Enter Sergio Bucio. He arrived in the Bluegrass State in late August 2016 to redesign Macias-Martinez's money-laundering operation, which enabled Macias-Martinez, his wife, and their network of coconspirators to launder more than $2 million in drug money. But the seemingly well-oiled machine turned out to have some unreliable parts: the couriers who received many of their bulk cash drops were undercover federal agents. Numerous arrests followed, and Bucio was charged with two counts of conspiracy to commit money laundering. He pleaded guilty to both counts and was sentenced to 109 months' incarceration. He challenges that sentence, arguing

(1) that the district court overestimated the amount of laundered funds attributable to him and (2) that he was entitled to a mitigating-role reduction. We affirm.

I.

Federal agents began to investigate the cartel-affiliated drug ring that included Bucio and Macias-Martinez in 2016. The organization sold vast amounts of heroin, fentanyl, cocaine, and meth not only in Scott County but throughout Kentucky and was enormously successful from its inception. But its sales volume, valued at around a million dollars a month, quickly outpaced its money-laundering capabilities. Almost overnight it went from a small drug trafficking organization to a thriving enterprise with millions of dollars in cash, completely overwhelming its capacity to repatriate funds to Mexico without drawing attention from law enforcement. The members of the Kentucky drug ring had no experience or expertise in money laundering at that scale. Nor was rural Kentucky the place to engage in a high-dollar international banking transaction without attracting a teller's attention. That was the result in June 2016, when Macias-Martinez received instructions from Mexico "to wire money to China," and his wife, Brazeida Sosa, tried to do so by transferring the funds through a personal account at Woodforest Bank. The bank quickly suspected Sosa of money laundering and closed the account.

So in August 2016, Bucio came to Kentucky to help Macias-Martinez with his cash problem. He spent two weeks with Macias-Martinez and Sosa in their Scott County home where the organization stashed its entire stockpile of drugs and cash.

During his brief stay in Kentucky, Bucio helped set up a money laundering operation that consisted of two components: bulk cash drops and structured deposits. The first component involved deliveries of cash to a courier by someone within the organization. Bucio himself made just such a delivery on September 1, 2016, when he delivered "200 diapers"—around $200,000—

in a Huggies box to an undercover agent posing as a courier. Macias-Martinez also personally delivered cash drops to undercover agents, and from September 1, 2016 to February 2, 2017, the organization made over $1,668,390 in bulk cash transfers.

For the second component, Bucio taught Sosa and other women to make deposits of less than $10,000 each into various designated bank accounts. The group received instructions from Mexico and, under Bucio's tutelage, began to target bigger, out-of-state financial institutions— Bank of America and Wells Fargo branches in Tennessee and North Carolina. Bucio personally accompanied the women on one of those early road trips. Employing the methods Bucio taught them, Sosa and her accomplices ultimately laundered about a million dollars.

With the money laundering scheme seemingly operating smoothly, Bucio left Kentucky for California in September 2016. But as Bucio learned when he was arrested in 2019, his efforts to keep the organizations' laundering off the government's radar were all for naught. And after arrest, he pleaded guilty to two counts of conspiracy to commit money laundering under 18 U.S.C. § 1956(h).

The base offense level for a money-laundering conviction under the Sentencing Guidelines begins at eight then increases based on the amount of laundered funds attributable to the defendant. USSG § 2S1.1(a)(2). The PSR determined that the funds attributable to Bucio fell between $1,500,000 and $3,500,000, warranting a sixteen-level increase, *id.* § 2B1.1(b)(1)(I), for a total base offense level of twenty-four. The PSR applied another six-level increase because the laundered funds were the proceeds of drug sales and another two-level increase because the defendant was convicted under 18 U.S.C. § 1956. After applying a three-level reduction for acceptance of responsibility, the PSR recommended a total offense level of twenty-nine and a criminal history category of II.

Bucio objected to the sixteen-level increase, arguing that he "affirmatively withdrew from the conspiracy when he left Kentucky in September" and that the amount of laundered funds attributable to him should, therefore, be limited only to the cash drops and structured deposits that occurred during his time in the Commonwealth—an amount he calculates to be $245,920. Bucio also argued that he should be given a downward role adjustment under § 3B1.2. The district court rejected both arguments, adopted the PSR's recommendation, and sentenced Bucio to 109 months' imprisonment.

## II.

Bucio challenges his sentence as procedurally unreasonable. We review the procedural reasonableness of a defendant's sentence for abuse of discretion. *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018). A district court abuses its discretion when its factual findings are clearly erroneous or its interpretation and application of the guidelines is incorrect. *Id.*

A.    AMOUNT-OF-LOSS INCREASE

Bucio contends that the district court should have based his sentence, not on the amount of funds laundered by all parties to the conspiracy, but solely on the amount of funds he directly had a hand in laundering. That argument is unpersuasive.

A district court may increase a defendant's base offense level based on the acts of other members of a conspiracy to the extent that those acts were within the scope of the jointly undertaken criminal activity, in furtherance of it, and reasonably foreseeable in connection with it. USSG § 1B1.3(a)(1)(B). The scope of conspiratorial conduct relevant for enhancing a sentence under the Guidelines "is 'significantly narrower' than the conduct needed to obtain a conspiracy conviction." *United States v. McReynolds*, 964 F.3d 555, 563 (6th Cir. 2020) (citation omitted). To increase a defendant's offense level based on the acts of others, the district court must make

two particularized findings: "(1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant." *Id.* (citation omitted).

1.      Scope of the Agreement

The scope of the agreement under the Guidelines refers to "the scope of the specific conduct and objectives" embraced by any "explicit agreement" or "implicit agreement fairly inferred from the conduct of the defendant and others." *Donadeo*, 910 F.3d at 895 (quoting USSG § 1B1.3 cmt. n.3(B)).  To determine the scope of the agreement, we look to several factors, including: "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme." *Id.*

*The existence of a single scheme.*  This criterion is satisfied when a scheme has a "single, unlawful objective." *Id.* at 896.  Here, Bucio pleaded guilty to two counts of conspiracy to commit money laundering, one for the bulk-cash-drop scheme and one for the structured-deposit scheme. Bucio's direct participation in both schemes during his time in Kentucky and his coconspirators' continued laundering activity after his departure were directed to the same unlawful goal—to launder, then repatriate, drug money on behalf of a Mexican drug cartel. *See United States v. Jackson*, 308 F. App'x 899, 906–07 (6th Cir. 2009) (drug quantities distributed by co-conspirators were attributable to the defendant under § 1B1.3 because "testimony showed that they were still working toward a common goal").

*Similarities in modus operandi.*  The scope of a defendant's "jointly undertaken criminal activity [is] broad enough to include the conduct" of coconspirators if the coconspirators launder money in "the exact same manner" as the defendant. *Donadeo*, 910 F.3d at 896-97.  The district

court found that Bucio made bulk cash drops to an undercover agent in the exact same manner as did Macias-Martinez. Also, the structured deposits carried out by Sosa and her co-conspirators were directly modeled on the methods Bucio taught them.

*Coordination of activities among schemers.* The district court found that the purpose of Bucio's trip to Kentucky was to help Macias-Martinez set up the laundering scheme. He provided instructions on how to structure bank deposits, and he rode along with Sosa and her accomplices on their first out-of-state trip to ensure that they structured the deposits properly. And during a cash drop, Macias-Martinez reported to an undercover agent that he could not agree to distribute cocaine without authorization from Bucio. Based on these and other facts, the district court concluded that "it is clear that part of the agreement was that [Bucio] would oversee the operations and make sure that the cartel was not being shorted in any way."

*Pooling of resources or profits.* Bucio and the other participants in the conspiracy all sought to move the same piles of cash from Macias-Martinez's home in Scott County to the cartel in Mexico by placing the money with couriers and in the cartel's designated bank accounts.

*Knowledge of the scope of the scheme.* Bucio came to Kentucky for the express purpose of fixing Macias-Martinez's struggling money laundering operation. He taught coconspirators methods for laundering proceeds from drug sales and oversaw the implementation of those methods. He clearly knew the scope of the scheme.

*Length and degree of defendant's participation in the scheme.* Bucio only directly participated in the scheme for two weeks in 2016. So the length of his active participation, considered alone, does not support a finding that the scope of the agreement encompassed all of the money laundered by members of the conspiracy. However, the degree of his participation does support such a finding. Bucio set the entire money laundering operation in motion: he was the

6

consultant hired to solve the operation's revenue-extraction logistics. All of the laundering activity that occurred after his departure was just a continuation of the system that he created. Thus, the scope of his agreement is coterminous with the scope of the laundering scheme.

In short, all six factors weigh in favor of finding that the laundering activity by the other members of the conspiracy was within the scope of Bucio's agreement.

2.       Foreseeability

For the funds laundered by Bucio's coconspirators to be attributable to him for purposes of sentencing, the district court also had to make particularized findings that the conduct of the other members of the conspiracy was foreseeable to him. *McReynolds*, 964 F.3d at 563. We have observed that the foreseeability requirement is satisfied where the defendant "was aware that the conspiracy was broader than merely the three transactions with which he was involved." *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002). Because Bucio personally oversaw the establishment of the entire money laundering scheme, the district court did not clearly err when it found that the actions of the other participants in the scheme were foreseeable to him.

Bucio's argument that he "withdrew from the conspiracy when he left Kentucky" is unpersuasive. "Defendants have the burden of proving withdrawal because it is an affirmative defense." *United States v. Lash*, 937 F.2d 1077, 1083 (6th Cir. 1991). To carry that burden, Bucio must show that he "took affirmative action to defeat or disavow the purpose of the conspiracy." *Id.* Bucio has presented no evidence of withdrawal beyond the fact that he left Kentucky and went back to California. "Mere cessation of activity is not sufficient" to establish withdrawal. *Id.*

Based on its particularized findings that the funds laundered by other members of the conspiracy were (1) within the scope of the agreement and (2) reasonably foreseeable, the district court determined that $2,468,000 was attributable to Bucio and adjusted his sentence accordingly.

That determination was not clearly erroneous. Therefore, we affirm the district court's upward adjustment of the base offense level.

B.     THE DOWNWARD ROLE ADJUSTMENT

The Guidelines require a two-level reduction in offense level for a minor participant in a criminal activity. USSG § 3B1.2(b). The district court rightly denied Bucio's request for the reduction.

A defendant only qualifies for the mitigating-role reduction if his role in committing the criminal offense was such that he is "substantially less culpable than the average participant" in the crime. *Id.* § 3B1.2 cmt. n.3(A). Sentencing courts weigh a variety of factors to determine whether to apply the reduction, including "the degrees to which a defendant understood the scope and structure of the criminal activity, participated in planning or organizing the activity, influenced or exercised decision-making authority, and stood to benefit from the activity, in addition to the nature and extent of his participation in the activity." *United States v. Sherrill*, 972 F.3d 752, 770 (6th Cir. 2020) (citing USSG § 3B1.2 cmt. n.3(C)). We review denial of a mitigating-role reduction for clear error. *United States v. Lanham*, 617 F.3d 873, 888 (6th Cir. 2010).

The district court considered all the § 3B1.2(b) factors and determined that a role reduction was improper. Bucio "had full knowledge of the scope and structure" of the criminal activity because he came to Kentucky to "oversee" the laundering scheme's implementation. He also "participate[d] in the planning of the activity" because he planned "the bank deposits that were made both while he was in Kentucky" and those "carried on thereafter." Bucio's counterargument, that the structured deposits were actually planned by an unknown person in Mexico, misses the point. Granted, there was testimony at sentencing that a person in Mexico conveyed the bank

account numbers and bank locations to Macias-Martinez and Sosa. But that does not alter the fact that Bucio unquestionably taught Macias-Martinez and Sosa what to do with that information.

The court also determined that Bucio exercised some decision-making authority over the operation. For example, Macias-Martinez told an undercover agent that he could not sell cocaine without Bucio's permission. And Sosa identified Bucio to another agent as "the one in charge." Bucio points to other testimony that Macias-Martinez told an undercover agent that he directed Bucio to deliver a bulk cash drop on his behalf as evidence that Bucio lacked any decision-making authority. But in context, Macias-Martinez's remarks were not intended to convey that Bucio lacked decision-making power; rather, they were intended to reassure the undercover agent that Bucio was a trustworthy member of the enterprise. What's more, Macias-Martinez made that remark during the same conversation with the same agent to whom he reported that he could not distribute cocaine without Bucio's authorization.

Finally, the court noted that there is no evidence one way or the other regarding the extent to which Bucio stood to benefit from the criminal activity. Ultimately, the court concluded that there was no reason to believe Bucio was substantially less culpable than other participants in the activity. That conclusion was not clearly erroneous.

### III.

For the reasons set forth above, we affirm the district court's sentence.