RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0195p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

>*Plaintiff-Appellee,*

*v.*

DAJA DON-KEVIA SMITH (22-1506); DAVONTE RAYSHAD HOSKINS (22-1552),

>*Defendants-Appellants.*

Nos. 22-1506/1552

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cr-00020—Paul Lewis Maloney, District Judge.

Decided and Filed:  August 23, 2023

Before:  BATCHELDER, COLE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant IN 22-1506.  Julia A. Kelly, WILLEY & CHAMBERLAIN LLP, Grand Rapids, Michigan, for Appellant in 22-1552.  Timothy P. VerHey, Andrew Byerly Birge, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

>BATCHELDER, J., delivered the opinion of the court in which COLE and NALBANDIAN, JJ., joined.  NALBANDIAN, J. (pp. 14–15), delivered a separate concurring opinion.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.  Daja Smith and Davonte Hoskins were co-conspirators in a large bank-fraud scheme, in which they called the victims, pretending to be from their bank, gained access to the victims' accounts, and stole their money.  Both pleaded guilty to conspiracy to commit bank fraud and aggravated identity theft, and both appealed, arguing that their sentences are procedurally unreasonable.  We affirm.

**I.**

**a. Background**

Between April 1, 2019, and April 1, 2020, Cedric Smith,[1] Daja Smith ("Smith"), and Davonte Hoskins defrauded banks and their customers of over a million dollars by using the account holders' personal identifying information without authorization.  Twenty different banks were subjected to the scheme.  The three conspirators would purchase, via online "dump sites," identification information that hackers stole from financial institutions.  This information included the customers' names, bank usernames, phone numbers, social security numbers, and which banks held the accounts.

After obtaining this information, the conspirators would access the victim's bank online, type in the username, and be prepared to select "forgot my password."  The conspirator would call the victim and "spoof" the phone number to make it appear that the conspirator was calling from the bank.  When the victim answered, the conspirator pretended to be a bank employee who was concerned about suspicious activity associated with the account.  He or she would tell the victim that the victim needed to give the bank an identification code to verify the victim's identity.  The co-conspirator would then trigger the "forgot my password" function on the website, which sends a one-time code to the victim's email or phone number.  The victim would provide that code to the conspirator, who would put the code in to change the password.  This

---

[1]Cedric Smith pleaded guilty and did not appeal his sentence.

gave the conspirator full access to the victim's account. The conspirator would withdraw funds and send them to bank accounts or debit cards of other people, which helped hide his or her identity as the spoofer.

On February 2, 2021, a federal grand jury indicted Daja Smith and Cedric Smith for bank fraud conspiracy and aggravated identity theft in violation of 18 U.S.C. § 1349 and 18 U.S.C. § 1028A. On May 4, 2021, Hoskins was added to the indictment and charged with the same crimes. Smith and Hoskins pleaded guilty to both charges and admitted to their knowing participation in the conspiracy. Hoskins had a written plea agreement, but Smith did not.

Daja Smith was heavily involved in the scheme. She made spoofing calls, sent stolen funds to her bank account, solicited others to participate by depositing some of the money into their debit-card accounts, wrote the spoofing script, and saved stolen bank information. She was directly involved with six of the twelve banks that were subject to the fraud; the other six are connected to her via the activity of her co-conspirators. On May 29, 2019, Smith told Hoskins that she did not want to work for him anymore.

Davonte Hoskins communicated on social media about the fraud, which included sharing the victims' stolen information, sharing the websites where this type of stolen information can be purchased, telling others how to purchase this information, and sharing debit card numbers that could receive the fraudulent proceeds. Hoskins also received money from the fraudulent transfers. He was directly involved with four, possibly five, of twelve banks; his connections with seven of the banks were indirectly connected to him through his co-conspirators. Hoskins was not held liable for the very first bank the conspiracy defrauded—People's United Bank— because he did not join the conspiracy until afterwards. Hoskins' involvement with American Savings Bank is disputed, as a video shows him bragging about receiving $30,000 in fraudulent transfers from this bank, but then in the same video he said he claimed to not know anything about fraudulent activity at this bank.

The defendants' Presentence Investigation Reports ("PSRs") determined the total loss amount based on both actual loss and intended loss. Actual loss, the amount of money stolen, was $1,171,673.97. Intended loss includes the actual loss plus the funds the conspirators tried to

steal but were unsuccessful at obtaining, which totaled $2,158,297.80. The PSR recommended that Hoskins and Smith each receive a 16-level enhancement to their Guidelines score because they each intended over $1.5 million in losses. *See* U.S.S.G. § 2B1.1(b)(1). Both defendants objected to this enhancement on the grounds that other conspirators' conduct should not be attributed to them because they were not directly involved with all the banks listed.

### b. Sentencing Hearings

### i. Smith's Sentencing Hearing

At Smith's sentencing hearing, the district court overruled her objection that some of the relevant conduct included in her offense level should not be included because she was not directly involved with several of the banks. The court found that it was "clear" that Smith knew "exactly what she was doing, knew exactly who she was dealing with, and she's out looking for other" potential victims' information. The court explained that even though including intended loss results in a greater enhancement, the court only had to come up with a reasonable estimate of loss and Smith should not be rewarded for the banks' doing their job and catching the fraud. Because Smith knew and regularly dealt with the main conspirators, Cedric Smith and Hoskins, whatever they did was jointly undertaken activity. Further, the district court concluded, the purpose of the scheme was to hide money, so calculating the loss as intended loss was appropriate.

The court sentenced Smith to 36 months in prison for the conspiracy charge, which included a downward variance for low likelihood of recidivism. The court also sentenced her to a consecutive 24 months for the aggravated-identity-theft charge. Smith was held accountable for the full amount of the intended losses and was ordered to pay restitution in the full amount of the actual loss, which was $1,171,673.97.

### ii. Hoskins's Sentencing Hearing

At his sentencing hearing, the district court overruled Hoskins's objections. Hoskins objected to including the conduct of others in his offense level and the use of intended loss, not actual loss, to calculate his Guidelines score. Although the court recognized that the Guidelines and its commentary are not binding, the court "believe[d] under the circumstances of this case, [that intended loss is] the accurate measure of the totality of the criminality of Mr. Hoskins and his co-conspirators." As for the relevant conduct objection, the court found that Hoskins was "clearly . . . jointly undertaking activity with his co-conspirators" and that the actions of the Smiths were "reasonably foreseeable within the meaning of the relevant conduct guideline" because Hoskins "knew precisely what [they] were doing." The court also found that it was "clear" that information about the elements of the fraud was going back and forth among the co-conspirators, which was relevant to the loss amount.

The court sentenced Hoskins to 48 months in prison for the conspiracy charge, which was within the Guidelines range, as well as 24 months for the aggravated-identity-theft charge, consecutive to the conspiracy sentence. The court attributed the full amount of the intended loss to Hoskins, minus the intended amount at Peoples United Bank because Hoskins was not part of the conspiracy at that time. The total loss attributed to him for purposes of scoring the Guidelines was $1,846,932.65, but he was only ordered to pay restitution in the amount of the actual loss, which was $966,922.97.

The defendants timely appealed.

## II.

Both defendants argue that the district court erred when it attributed to them the conduct of others involved in the conspiracy. Hoskins also argues that the district court erred when it included intended-loss amounts in his offense level. And Smith argues that the district court should not have ordered her to pay all the restitution in full.

Because the defendants preserved their arguments that their sentences are procedurally unreasonable, we review for an abuse of discretion. *United States v. Nunley*, 29 F.4th 824, 830

(6th Cir. 2022). Preserved objections to fact-findings and the district court's determination of the amount of loss we review under a deferential clear-error standard. *United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019); *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021). Legal questions, such as the interpretation of the Guidelines, we review de novo. *Riccardi*, 989 F.3d at 481.

### a. Attribution of Relevant Conduct

Both defendants argue that the district court erred when it attributed to each of them all the loss from the conspiracy instead of attributing only loss they were directly involved with. Both argue that their co-conspirators' separate fraud at the other banks was not within the scope of their agreements, nor was that fraud reasonably foreseeable, because there is no proof they were involved with or had knowledge of that activity. Smith also argues that the district court failed to make the required particularized findings to hold her accountable for the conduct of others.

We review de novo whether conduct is "relevant conduct." *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018). We review for clear error the district court's underlying factual findings. *Id.*

To determine the amount of loss attributable to each defendant under the theft guideline, § 2B1.1(b), the court looks at any "relevant conduct." Under the Guidelines, relevant conduct is:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

(i) within the scope of the jointly undertaken criminal activity,

(ii) in furtherance of that criminal activity, and

(iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4) any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  A defendant may be held accountable for the conduct of others only if that conduct meets all three criteria in § 1B1.3(a)(1)(B)(i)-(iii).  *Donadeo*, 910 F.3d at 894; U.S.S.G. § 1B1.3 cmt. n.3(A).

To hold a defendant accountable for the conduct of others in the conspiracy, the district court "must make particularized findings with respect to both the scope of the defendant's agreement [to engage in jointly undertaken criminal activity] *and* the foreseeability of his co-conspirators' conduct before holding the defendant accountable for that conduct." *Donadeo*, 910 F.3d at 899 (emphasis and alteration in original) (citation and quotation marks omitted).

**Scope.**  First, we look at the scope of the criminal conduct these defendants "agreed to jointly undertake." *United States v. Bailey*, 973 F.3d 548, 574-75 (6th Cir. 2020) (quoting *Donadeo*, 910 F.3d at 895).  The scope of the conduct that a defendant may be held accountable for under the Guidelines is "narrower than the conduct embraced by the law of conspiracy." *Id.* at 574 (citation omitted).  "[A]ny explicit agreement [and any] implicit agreement fairly inferred from the conduct of the defendant and others may be considered." *Donadeo*, 910 F.3d at 895 (alterations in original) (citation and quotation marks omitted).  Six factors help us determine the scope of the conduct that a defendant agreed to jointly undertake: "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme." *Id.* (citation omitted).

Factor one—existence of a single scheme.  Here, it is clear that one scheme existed: fraud via spoofing, using stolen information to steal money from people's bank accounts.  Each of the conspirators engaged in this scheme.  This factor is easily met.

Factor two—modus operandi. This factor is just as easily met, as all the modus operandi were identical. After the stolen information was obtained, the conspirators would spoof the bank's phone number, get the victim to provide a code, and change the account password so money could be stolen. The money would then be moved to different accounts to conceal where the money came from and to hide the connection to the conspirators.

Factors three and four—coordination of activities and pooling of resources or profits. To engage in this scheme, the co-conspirators had to coordinate and share resources, so these factors are met. Indeed, they shared the stolen information, shared the account information for depositing the stolen funds, and used the same specific script when spoofing the bank's phone number. Smith herself wrote and saved the script. She also regularly used social media to find individuals willing to share their account information so the conspiracy would have accounts into which to deposit the stolen funds. Similarly, Hoskins shared information about how to conduct the fraud and who would receive the stolen funds. Smith and Hoskins also both deposited stolen funds into their own accounts.

Factor five—knowledge of the scope of the scheme. Smith, Hoskins, and Cedric Smith all knew each other. They knew what the scheme entailed. They communicated with each other throughout the duration of the conspiracy. Both defendants clearly knew the scope of the scheme. This factor is satisfied.

Factor six—length and degree of participation. Despite Smith's claim that she left the conspiracy, she was involved the entire time. Her PSR shows that she was directly involved with one of the bank frauds in April 2019, and the last bank fraud she was involved with ended in April 2020. As described above, she was thoroughly involved with the entire conspiracy the whole time. For Hoskins's part, he was involved the entire time except for the very first bank, for which the district court did not hold him responsible.

Because Smith and Hoskins both engaged in the activity described above, the district court correctly found that all the conspirators' conduct was within the scope of the criminal conduct the defendants "agreed to jointly undertake."[2]

**Criminal activity and foreseeability.** Requirements two and three of § 1B1.3(a)(1)(B)—that the activity be in furtherance of criminal activity and that it was reasonably foreseeable—are also easily met. The activity was clearly in furtherance of criminal activity; the whole point was to steal other people's money. It was also reasonably foreseeable that others in the conspiracy, who knew how to conduct the fraudulent scheme, might steal funds from banks with which neither Smith nor Hoskins was directly involved. Smith played a role in major parts of the conspiracy by providing bank accounts to deposit stolen funds into and writing the spoofing script. Hoskins also played a major role. He found the victims' information online so the conspirators could use it to steal money. It was reasonably foreseeable that others in the conspiracy would use this information to conduct more fraud.

The district court correctly held both defendants responsible for the relevant conduct of their co-conspirators. When it sentenced Smith, the district court stated that Smith "aligned herself with Mr. Hoskins and Mr. Smith," who were the leaders, and that she "knew exactly what she was doing" and whom "she was dealing with on a regular basis." The court also explained that, even though not all of the money was deposited into her account, "the whole purpose of th[e] scheme is to hide where the money is going." And when it sentenced Hoskins, the court stated that "this clearly was jointly undertaken activity. Knowledge is not the same as . . . actions being reasonably foreseeable. Mr. Hoskins knew precisely what Mr. Smith and Miss Smith were doing. He was jointly undertaking activity with his co-conspirators. The actions of the Smiths were, in the [c]ourt's judgment, reasonably foreseeable within the meaning of the relevant conduct guidelines." The court elaborated that there was "information going back and [f]orth concerning the elements of the fraud in terms of banks, numbers, etcetera, which the

---

[2]In her reply brief, Smith argues that the government forfeited its detailed argument about the scope of her conduct and joint intent because the government did not make these arguments at sentencing. She argues that, instead, they focused more broadly about accountability for a conspiracy generally. We disagree. Not only did the government make this argument, but it argued that Smith bought the stolen information, that she directly talked to the victims, stole their money, and routed the money elsewhere. These arguments are directly related to scope and joint intent.

[c]ourt also considers to be important in its consideration of the appropriate loss amount in this case." The district court did not err.

Smith's argument that the district court did not make the required particularized findings to hold her accountable for the relevant conduct of others is also without merit. Because Smith did not raise this argument before the district court, we review it for plain error. *Donadeo*, 910 F.3d at 899. The threshold for a "particularized finding" is low. *See id.* at 899-900. And here, the district court's statements that Smith knew with whom she was dealing and what she was doing relate to both the scope of the agreement and the foreseeability of her co-conspirators' activities. The district court did not plainly err.

### b. Intended Loss

Hoskins argues that the Guidelines commentary, which allows a court to hold a defendant responsible for both actual and intended loss, conflicts with the ordinary definition of "loss," so he should be held responsible for only the actual loss, not the intended loss. *See* U.S.S.G. § 2B1.1 cmt. n.3(A). This court recently decided this issue in a similar case. In *United States v. You*, 74 F.4th 378 (6th Cir. 2023), we held that the term "loss" in the fraud guideline is ambiguous, so the Guidelines commentary is entitled to deference. *Id.* at 397–98. We think it would be useful to elaborate a bit further on *why* the term "loss" in U.S.S.G. § 2B1.1 is ambiguous. Because we cannot use the commentary itself to find an ambiguity,[3] we must look to the Guidelines themselves to determine whether the word "loss" is ambiguous. *See Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").[4] "[B]efore concluding that a rule is genuinely ambiguous, a court must

---

[3]We do not interpret *You* as holding that the commentary makes the term "loss" ambiguous. The court explicitly referenced the "context and purpose" of the Guidelines when it found that "loss" is ambiguous. *You*, 74 F.4th at 397.

[4]In *Robinson*, the court found that the term "employees" was ambiguous because in some sections of the statute it meant one thing, and in other sections it meant something else. *Robinson*, 519 U.S. at 343-44. The court

exhaust all the 'traditional tools' of construction," which include looking at the text, structure, history, and purpose of the guideline. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-16 (2019); *United States v. Phillips*, 54 F.4th 374, 380 (6th Cir. 2022); *Riccardi*, 989 F.3d at 483. This court has held that *Kisor* applies to interpretation of the Guidelines. *Riccardi*, 989 F.3d at 479-80, 485; *see also Phillips*, 54 F.4th at 379.

Although the dictionary definition of the term "loss" does not contemplate anything close to intended loss, *Riccardi*, 989 F.3d at 486, *Kisor*'s demand that we look at the whole structure of the Guidelines results in our conclusion that the term "loss" is ambiguous. In every sentencing, a court must follow the instructions in guidelines §§ 1B1.1, 1B1.2, and 1B1.3 to determine the offense level for a particular crime. Section 1B1.1 instructs a court to determine the relevant substantive-offense (the crime the defendant committed) guideline applicable pursuant to § 1B1.2. After the court determines the applicable substantive-offense guideline per § 1B1.2's instructions, the court must use both § 1B1.3, which is the relevant-conduct guideline, and the substantive-offense guideline to determine the offense level. The relevant-conduct guideline instructs the court to consider "all harm that resulted from the acts and omissions [of the jointly undertaken criminal activity] and *all harm that was the object of such acts and omissions*" when deciding what the offense level is. U.S.S.G. § 1B1.3(a)(3) (emphasis added).

In cases like this one, § 1B1.2 instructs the court to refer to § 2X1.1 (Attempt, Solicitation, or Conspiracy) and the substantive-offense guideline to determine the offense level. *Id.* § 1B1.2(a). Section 2X1.1(a) tells the court to use the "base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." *Id.* § 2X1.1(a). The applicable substantive-offense guideline here is the fraud guideline, U.S.S.G. § 2B1.1. The court must use the instructions in both the fraud guideline (§ 2B1.1) and the relevant conduct guideline (§ 1B1.3) to determine the base-offense level. The fraud guideline requires a base offense level of 6 or 7, and then increases according to the amount of "loss" involved. *Id.* § 2B1.1(a), (b)(1).

---

then went on to resolve the ambiguity and determine what the term "employees" means by looking at the broader context of the statute. *Id.* at 345-46.

The use of the term "harm" in the relevant-conduct guideline clearly contemplates harm that actually occurred *and* harm that the person intended to cause. In the context of fraud, regardless of whether the case involves a conspiracy, that harm is "loss." The relevant-conduct guidelines' contemplation of actual and intended loss makes the term "loss" in the fraud guideline ambiguous, i.e., whether it means only actual loss or also includes intended loss. If the fraud guideline does not include intended loss, then the court cannot meaningfully apply the relevant-conduct guideline, which is applicable to all sentencings and contemplates intended harm as conduct for which a defendant should be held accountable. The context of the Guidelines therefore renders the term "loss" in the fraud guideline (§ 2B1.1(b)) ambiguous.

Because the word "loss" under U.S.S.G. § 2B1.1 is ambiguous and the commentary meets the other two *Kisor* considerations as explained in *You*, the district court did not err when it considered intended loss in determining Hoskins's offense level. *You*, 74 F.4th at 397–98.

### c. Smith's Restitution Order

We review restitution orders for abuse of discretion. *Bailey*, 973 F.3d at 576. The government must prove the amount of restitution by a preponderance of the evidence. *Id.*; 18 U.S.C. § 3664(e). A district court "does not err by using conspiracy principles to determine a defendant's amount of restitution." *Bailey*, 973 F.3d at 576. A defendant may be ordered to pay a restitution amount that "reflects the loss caused by the entire conspiracy, even wh[en the court] simultaneously find[s] an amount of loss that reflects only conduct closely related to the defendant." *Id.*

The Mandatory Victim Restitution Act ("MVRA") governs restitution awards. 18 U.S.C. § 3663A. The amount of loss is different from restitution; restitution makes a victim whole, while the Guidelines punish for wrongdoing. *Bailey*, 973 F.3d at 576. But, even if a defendant played only a small role in the conspiracy, the amount the victims lost because of the conspiracy does not change. *Id.* The MVRA gives the district court the discretion to distribute liability for restitution for the victims' losses over multiple defendants if they are responsible for said loss, but it is not required to do so. 18 U.S.C. § 3664(h); *Bailey*, 973 F.3d at 576.

Because the district court is not required to apportion the restitution amount equally amongst the defendants, the district court did not err when it ordered Smith to pay restitution in full.  The court found that Smith was heavily involved in the conspiracy.  Several of her actions allowed the conspiracy to thrive, such as her documenting how to make a spoofing phone call.  We find no error in the district court's using of its broad discretion to order restitution and its using conspiracy principles to do so.

**III.**

For the foregoing reasons, we affirm.

---

**CONCURRENCE**

---

NALBANDIAN, Circuit Judge, concurring.  I agree with the majority that we are bound by this Court's decision in *United States v. You*, 74 F.4th 378 (6th Cir. 2023), and I join the opinion.  I write separately to express my disagreement with *You*'s conclusion that "loss" is ambiguous and that we should therefore defer to the guidelines commentary's view that "loss" means the "greater of actual or intended loss."  *See id.* at 397 (quoting U.S.S.G. § 2B1.1 cmt. n.3(A)).

**I.**

We must answer whether "loss" in U.S.S.G. § 2B1.1(b)(1) is ambiguous before turning to the definition that the guidelines commentary provides.[1]  "Where, as here, a legal text does not define a term, we generally 'give the term its ordinary meaning.'"  *United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021) (citation omitted).  In *Riccardi*, we said that we didn't need "to decide whether one clear meaning of the word 'loss' emerges from the potential options," because comment note 3(F)(i), the applicable commentary to § 2B1.1 in *Riccardi* (and not the applicable commentary in this case or in *You*), was unreasonable in any event.[2]  *Id.*

*You* decided the question *Riccardi* left open—that is, whether "loss" in § 2B1.1(b)(1) is ambiguous.  And *You*, claiming to rely on *Riccardi*, held that "loss" is ambiguous.  *You*, 74 F.4th at 397 ("Although *Riccardi* declined to declare 'loss' ambiguous, its reasoning makes it easy for us to conclude that the definition of loss 'has no single right answer.'" (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019))).  But I think *You* took *Riccardi* a step too far because *Riccardi*, which again dealt with a different commentary provision, explicitly left open the question of whether "loss" is ambiguous.

---

[1]U.S.S.G. § 2B1.1(b)(1) says, "If the loss exceeded $6,500, increase the offense level as follows[.]"  The applicable commentary in *You* and in this case defines "loss" as the "greater of actual or intended loss."  U.S.S.G. § 2B1.1 cmt. n.3(A).

[2]The relevant commentary in *Riccardi* imposed a $500 minimum loss amount for each stolen gift card involved in that case, regardless of the actual value of the gift card.  *Id.* at 483.

I think "loss" is clear because "anyone who heard th[e] phrase ["loss"] would presume that the speaker was referring to the damage that resulted from the crime . . . . not the amount almost lost or intended to be lost." *United States v. Kennert*, No. 22-1998, 2023 WL 4977456, at *4 (6th Cir. Aug. 3, 2023) (Murphy, J., concurring). In other words, for the reasons Judge Murphy gave in *Kennert*, I think the ordinary meaning of "loss" is how much loss the defendant actually caused, not how much loss the defendant intended to cause. *See Kennert*, 2023 WL 4977456, at *4 ("Frankly, I find the phrase 'actual loss' redundant (sort of like 'minor modification' or 'necessary requirement').")); *United States v. Banks*, 55 F.4th 246, 255–58 (3d Cir. 2022) (holding that "loss" is not ambiguous and only refers to actual loss).

Because I think "loss" is not ambiguous and does not include intended loss, I would not defer to the commentary's interpretation of "loss" as "the greater of actual or intended loss."[3] *See* U.S.S.G. § 2B1.1 cmt. n.3(A).

## II.

But *You* binds us, so I concur.[4]

---

[3]I note that I disagreed with the majority in *Riccardi* on what kind of deference we should give the commentary to the guidelines if a guidelines provision is unclear. The majority applied the *Kisor* framework to the commentary to the guidelines. *Riccardi*, 989 F.3d at 485–86. I disagreed and would have applied *Stinson* deference, since that's the latest word the Supreme Court has given us on "the standard for deferring to sentencing guideline commentary." *Id.* at 490 (Nalbandian, J., concurring) (citing *Stinson v. United States*, 508 U.S. 36 (1993)); *see id.* at 491 (explaining that the Supreme Court didn't intend "that *Stinson* and *Seminole Rock* would march in lockstep").

[4]The majority says that we could not properly apply U.S.S.G. § 1B1.3, the relevant-conduct guideline, if "loss" meant anything other than "actual and intended loss." (Maj. Op. at 13.) But *You* already decided that "loss" is ambiguous, so I would not use § 1B1.3 to interpret § 2B1.1. I note that the majority's relevant-conduct argument under § 1B1.3 is separate from any argument as to § 2X1.1, which governs relevant conduct—that is, "intended offense conduct"—in attempt cases. *See Kennert*, 2023 WL 4977456, at *5 (Murphy, J., concurring).